[No. G015591. Fourth Dist., Div. Three. Sept. 30, 1996.]

CAROL LYNN SAIKA, Plaintiff and Appellant, v.
ROBERT BARTON GOLD, Defendant and Respondent.

**COUNSEL**

Wagner & Scuderi and Jerome M. Wagner for Plaintiff and Appellant.

Robert Barton Gold, in pro per., Cifarelli & Cifarelli and Philip S. Cifarelli for Defendant and Respondent.

## Opinion

**SILLS, P. J.—** **(1)** Arbitration has become highly favored as an economical, efficient alternative to traditional litigation in law courts. (See, e.g., *Moncharsh* v. *Heily & Blase* (1992) 3 Cal.4th 1, 9 [10 Cal.Rptr.2d 183, 832 P.2d 899] ["the Legislature has expressed a 'strong public policy in favor of arbitration . . . .' "]; *Ericksen, Arbuthnot, McCarthy, Kearney & Walsh, Inc.* v. *100 Oak Street* (1983) 35 Cal.3d 312, 322 [197 Cal.Rptr. 581, 673 P.2d 251] ["speedy and relatively inexpensive means of dispute resolution"]; *Madden* v. *Kaiser Foundation Hospitals* (1976) 17 Cal.3d 699, 707 [131 Cal.Rptr. 882, 552 P.2d 1178] ["common, expeditious, and judicially favored"].) And given its favored status, courts "indulge" every "intendment" to implement and give effect to arbitration proceedings. (*Moncharsh, supra,* 3 Cal.4th at p. 9; *Doers* v. *Golden Gate Bridge etc. Dist.* (1979) 23 Cal.3d 180, 189 [151 Cal.Rptr. 837, 588 P.2d 1261]; *Pacific Inv. Co.* v. *Townsend* (1976) 58 Cal.App.3d 1, 9 [129 Cal.Rptr. 489].)

The "very essence" of arbitration is finality. (*Moncharsh* v. *Heily & Blase, supra,* 3 Cal.4th at p. 9; *Blanton* v. *Womancare, Inc.* (1985) 38 Cal.3d 396, 402 [212 Cal.Rptr. 151, 696 P.2d 645, 48 A.L.R.4th 109].) By choosing arbitration, parties avoid the palaver of procedural challenges that lend, at least for a time, uncertainty to any judgment rendered in the courts. With only very narrow exceptions, an arbitrator's decision cannot be reviewed for error of fact or law; the parties do not get to appeal an adverse decision. (*Moncharsh, supra,* 3 Cal.4th at p. 11.) " 'Conclusiveness is expected; the essence of the arbitration process is that an arbitral award shall put the dispute to rest.' " (*Id.* at p. 10, quoting Comment, *Judicial Deference to Arbitral Determinations: Continuing Problems of Power and Finality* (1976) 23 UCLA L.Rev. 948-949.) Or, to put it another way, a nonfinal arbitration is, in the last analysis, an oxymoron. (See generally, *Moncharsh, supra,* 3 Cal.4th 1 [because of the need for arbitral finality, California Supreme Court concluded arbitration awards are not subject to review for errors of law even when, as Justice Kennard pointed out in her dissent, the result is to tolerate substantial injustice].)

■ The present case concerns an arbitration agreement between a doctor and a patient in which there is virtually no conclusiveness when the *patient* wins the arbitration. A trial de novo clause within the arbitration agreement purportedly allows either party to disregard the results of the arbitration and litigate in the courts when the arbitration award *exceeds* $25,000, but, as we explain, the practical effect of the clause is to tilt the playing field in favor of the doctor. By making arbitration virtually illusory as far as one side is concerned, the clause contravenes the strong public

policy favoring arbitration. Accordingly, we conclude the trial de novo clause is not enforceable in equity. It was error for the trial court to deny the patient's petition to confirm the arbitration award in this case.

I

After Carol Lynn Saika received a chemical skin peel of her face, she sued Dr. Robert Barton Gold for malpractice, claiming she was severely burned by the process. Gold answered the complaint, denied the allegations and claimed Saika had executed an arbitration agreement. He filed a motion to compel arbitration and stay all proceedings.

Gold's requests were granted, but the arbitration resulted in a large award, $325,000, in favor of Saika. However, the arbitration agreement also contained a trial de novo clause which permitted *either* party to request a trial with the superior court in the event any arbitration award exceeded $25,000.

Here is the exact language of the trial de novo clause: "In the event that an arbitration award made pursuant to the terms of this agreement is equal to or greater than Twenty Five Thousand Dollars ($25,000.00), either the Doctor or myself [*sic*] may request a 'trial de novo,' which means new trial, by filing a civil action within sixty (60) days from the date of the arbitration award in a court of law having jurisdiction. Upon the filing of a civil action, the arbitration award that was made under the terms of the Patient-Physician Arbitration Agreement will be null and void and may not be used for any purpose thereafter. An award which is equal to or greater than Twenty Five Thousand Dollars ($25,000.00) shall become binding sixty (60) days after such award is made, provided neither party has filed suit as provided herein, within those sixty (60) days. Neither party to this agreement shall move to have such an arbitration award confirmed by a court of law until the sixty (60) day time period has elapsed."

Gold filed a request for a trial de novo, citing the clause. Saika responded by filing a motion to strike it and by filing a petition to confirm the arbitration award. The court granted Gold's request, and denied both the motion to strike and the petition to confirm. Saika now appeals from the order dismissing the petition to confirm.[1]

In the trial court the parties disputed whether Saika ever signed the arbitration agreement. The details of the dispute are irrelevant for our purposes here; suffice to say the trial court impliedly found, by denying Saika's petition, that she did indeed sign the agreement and even knew of the

---

[1]The order is appealable. (Code Civ. Proc., § 1294, subd. (b).)

trial de novo clause. Accordingly we assume that to be the case in reviewing the trial court's order.

## II

We begin with the seminal decision in this area of the law, *Beynon v. Garden Grove Medical Group* (1980) 100 Cal.App.3d 698 [161 Cal.Rptr. 146], which, like the case before us, arose out of a medical malpractice claim. *Beynon's* applicability is the chief point on which the parties have joined issue.

In *Beynon,* the plaintiff was the employee of a company which had a prepaid health care service plan. The master policy had a provision making arbitration, under three arbitrators, the exclusive remedy for resolving any controversy under the plan, but a subsection of that provision allowed the health care provider to reject without cause an arbitration decision and require resubmission of the controversy to a second arbitration panel, this one made up of three doctors. (See 100 Cal.App.3d at pp. 701-703.)

A dispute arose over alleged surgical malpractice committed by a doctor who was a member of a medical group used by the plan. After learning of the arbitration clause in the master policy, the plaintiff proceeded to arbitration before a panel of attorneys who unanimously returned a $60,000 award. The doctor and the medical group then gave notice of their rejection of the arbitrators' decision and their intention to require resubmission of the dispute to the second panel. The plaintiff countered with a petition to confirm the $60,000 award. The trial court denied the petition, but the appellate court reversed, holding that the award should have been confirmed. (100 Cal.App.3d at pp. 702-704.) In essence, the *Beynon* court reasoned that the clause allowing the health care providers to reject the first arbitration could not be enforced in light of the unilateral advantage it conferred on the stronger party, combined with the absence of any evidence the clause was ever "called" to the plaintiff's attention. (See *id.* at pp. 707-708 ["The provisions of paragraph B are . . . 'especially disadvantageous' for the beneficiary. A subscriber to a health care service plan cannot be bound by such provisions where they were not called to his or her attention at the time of enrollment or at least before the cause of action arose."].)

The two threads of lack of notice and unfairness run through the *Beynon* opinion. With regard to the former, the court noted that the master policy was a classic adhesion contract, where the party with the superior bargaining power offered the deal on "essentially a 'take it or leave it' basis without opportunity for individual bargaining." (100 Cal.App.3d at p. 705.) With

regard to the latter, the *Beynon* court emphasized the unilateral, one-sided nature of the rejection clause. The clause transformed arbitration "into virtually a 'heads I win, tails you lose' proposition." (*Id.* at p. 706.) Elsewhere, the clause was described as making arbitration a "one-sided procedure weighted against the subscriber." (*Id.* at p. 712.) Instead of being a "speedy and inexpensive means of resolving disputes in a neutral forum," arbitration became "an expensive and protracted proceeding favoring the health plan and the health care provider." (*Ibid.*)

The case before us differs with *Beynon* in three respects. First, *Beynon* involved a prepaid health plan, with a rejection clause which was never called to the attention of the employee covered by the plan. Here, we must accept the implied finding by the trial court that Saika *did* know of the trial de novo clause and specifically signed the arbitration agreement.

Second, *Beynon*'s rejection provision was wholly unilateral. Only one side—the health care providers—could escape the result of the first arbitration. By contrast, the trial de novo clause in the present case affords an ostensible modicum of bilaterality. Once a $25,000 threshold is cleared, either the patient or the doctor can reject the arbitration and litigate.

Finally, the rejection clause in *Beynon* provided for a second *arbitration*; when the second arbitration was over, at least the results of that arbitration were binding. (See 100 Cal.App.3d at p. 703, fn. 2.) Here, the trial de novo clause allows for full litigation of any malpractice claim in which the arbitration results in an award in excess of $25,000.

We address this last difference first, because that difference, if anything, only emphasizes how the trial de novo clause here thwarts the salutary aims of arbitration. In *Beynon*, if the doctor did not like the result of the arbitration, the patient had to run but one more gauntlet, another arbitration. In the present case, by contrast, the trial de novo clause means, in practical effect, that the patient must enter a whole new world—litigation in the courts. Rather than facing simply another round of a process that is speedy, simple and efficient, the patient must begin at square one in the courts, with the potential, for example, of an appeal which might even (if some federal question were involved) make its way to the United States Supreme Court. Thus, on the third point, *Beynon* applies to the present case a fortiori. If the rejection clause meant *incrementally* increased expense and delay in *Beynon*, a trial de novo clause such as the one here means increased expense and delay on a substantially increased order of magnitude.

The second difference—the modicum of bilaterality present here but not in *Beynon*—is inconsequential. In practical reality, the trial de novo clause is virtually meaningless to the patient.

True, there is a theoretical class of cases where the trial de novo clause could arguably benefit a patient—namely, situations where the initial arbitration award *exceeds* $25,000 but is *still so low* that it represents an injustice. (Cf. *Moncharsh* v. *Heily & Blase, supra*, 3 Cal.4th at p. 33 (dis. opn. of Kennard, J.) [expressing concern that arbitration awards should be just].) For example, the case before us appears to involve facial disfigurement. The arbitrators handed down what appears, at least insofar as the record discloses, an appropriately large award. Had they only given Saika $25,001, the trial de novo clause would indeed have been of some benefit to her.

But, in the vernacular of late 20th century America, let us "get real." As a practical matter, the benefit which the trial de novo clause confers on patients is nothing more than a chimera. The odds that an award will *both* (a) clear the $25,000 threshold but (b) *still* be so low that the *patient* would *want* to have a trial de novo are so small as to be negligible. Unless we are to assume that arbitrators in medical malpractice cases regularly and capriciously make awards substantially below what justice requires—and that is an assumption which we will not indulge—the cases where the trial de novo clause could possibly benefit the patient are going to be rare indeed.

In sum, while the trial de novo clause in the present case purports to apply to both parties, it is the same "heads I win, tails you lose" proposition that the court condemned in *Beynon*. (See *Beynon* v. *Garden Grove Medical Group, supra*, 100 Cal.App.3d at p. 706.)

We now come to the only real basis on which *Beynon* might be distinguished, the question of whether the arbitration clause was ever "called to [the] attention" of the patient. (See 100 Cal.App.3d at p. 705.) In *Beynon* the patient was unaware she was even required to arbitrate, much less aware that the health care provider could escape the results of any arbitration. (See *id.* at p. 702 [plaintiff filed suit first, then learned of arbitration provision in group policy].) Here, by contrast, we assume that Saika read the arbitration agreement, including the trial de novo clause, and signed it.

While the difference does represent a real factual difference in the two cases, it is not dispositive on the question of whether public policy countenances the trial de novo provision at hand.

The *Beynon* court may not have actually used the word "illusory" in its discussion, but the illusory nature of the rejection clause acted as a kind of basso continuo for the court's discussion on the one-sided, unilateral nature of the rejection clause. In *Beynon*, the rejection clause "unreasonably limit-[ed]" the obligations of the health plan. (100 Cal.App.3d at p. 706.) It

deprived the arbitration remedy of the very speed and economy which might otherwise compensate the plaintiff for the loss of the right to present her case to a jury. (See *ibid.*) For the plaintiff, the clause meant the worst of both worlds: no jury, but additional cost and delay inflicted by her opponent at will. (See *id.* at p. 712.)

In other words, the rejection clause meant the arbitration agreement really did not function as an *arbitration* agreement. The promise of an inexpensive, speedy resolution to the claim evaporated with one party's unilateral ability to avoid results it did not like.

We have already referred to the strong public policy favoring arbitration. That policy is manifestly undermined by provisions in arbitration clauses which seek to make the arbitration process itself an offensive weapon in one party's arsenal.

Moreover, public confidence in arbitration in large part depends on the idea that arbitration provides a *fair* alternative to the courts. That confidence is manifestly undermined when provisions in arbitration clauses provide that when one side wins the game doesn't count. To uphold this clause would only encourage lawyers for health care providers to find ways in which arbitration agreements could be structured to, in effect, load the dice in favor of their clients. Alternative dispute resolution must be a genuine *alternative* to litigation in the courts, not a sham process by which one party to an agreement can increase the total costs of making a claim against it.

■ . In this regard, our conclusion is dictated by the principles of equity which ultimately underlie the enforcement of arbitration agreements. It is well settled that a proceeding to compel arbitration is a suit *in equity* to compel the specific performance of a contract. (E.g., *Freeman* v. *State Farm Mut. Auto Ins. Co.* (1975) 14 Cal.3d 473, 479 [121 Cal.Rptr. 477, 535 P.2d 341]; *Trubowitch* v. *Riverbank Canning Co.* (1947) 30 Cal.2d 335, 347 [182 P.2d 182]; *Engineers & Architects Assn.* v. *Community Development Dept.* (1994) 30 Cal.App.4th 644, 653 [35 Cal.Rptr.2d 800]; *Brock* v. *Kaiser Foundation Hospitals* (1992) 10 Cal.App.4th 1790, 1795 [13 Cal.Rptr.2d 678].)

It is equally well settled that specific performance cannot be enforced against a party to a contract which is not, as to that party, "just and reasonable." (Civ. Code, § 3391 ["Specific performance cannot be enforced against a party to a contract in any of the following cases: [¶] . . . [¶] 2. If it is not, as to him, just and reasonable."]; see also *MacFadden* v. *Walker* (1971) 5 Cal.3d 809, 814-815 [97 Cal.Rptr. 537, 488 P.2d 1353, 55

A.L.R.3d 1] [antiforforfeiture principle of equity justified granting even willfully defaulting vendee specific performance of land sale contract where forfeiture had no reasonable relation to default]; *O'Connell* v. *Lampe* (1929) 206 Cal. 282, 284 [274 P. 336] [specific performance is proper if the contract is, among other things, "not a hard or unconscionable bargain"]; *O'Hara* v. *Wattson* (1916) 172 Cal. 525, 535 [157 P. 608] [in actions for specific performance of land sale contracts, the plaintiff must prove the contract was not, as to the other party, "an unconscionable, inequitable or hard bargain"].)

 In the present case, we are concerned with the effect of a trial de novo clause on an arbitration agreement, not strictly an arbitration agreement per se. But that makes no difference. If equitable principles govern the specific performance of arbitration agreements, they govern clauses within arbitration agreements which purport to limit the favored remedy of arbitration. As we have shown, the trial de novo clause here is most inequitable in its impact on "the other party." The net effect, after all, of enforcing the trial de novo clause is to deny the remedy of arbitration to that party. There is no reason in equity to enforce it.

### III

Because it renders arbitration an illusory remedy for one party, the trial de novo clause here contravenes the strong public policy in favor of arbitration despite the fact that the patient signed the agreement and may be presumed to have known of the clause. Equity will not enforce this clause. Accordingly, the order denying Saika's petition to confirm the arbitration award is reversed. The case is remanded with directions to the trial court to enter a new order confirming the $325,000 arbitration award. Saika is to recover her costs on appeal as well.

Crosby, J., and Rylaarsdam, J., concurred.