[No. B187818. Second Dist., Div. Eight. June 27, 2006.]

CHARLES HIGGINS II et al., Petitioners, v.
THE SUPERIOR COURT OF LOS ANGELES COUNTY, Respondent;
DISNEY/ABC INTERNATIONAL TELEVISION, INC., et al., Real Parties
in Interest.

## COUNSEL

Mesisca, Riley & Kreitenberg, Patrick A. Mesisca, Jr., Dennis P. Riley and Mike N. Vo for Petitioners.

No appearance for Respondent.

Christensen, Miller, Fink, Jacobs, Glaser, Weil & Shapiro, Patricia L. Glaser, Mark L. Block and Jeffrey D. Dermer for Real Parties in Interest.

## OPINION

**RUBIN, J.**—In this writ proceeding, five siblings who appeared in an episode of the television program *Extreme Makeover: Home Edition* (*Extreme Makeover*) challenge an order compelling them to arbitrate most of their claims against various entities involved with the production and broadcast of the program. Petitioners claim the arbitration clause contained in a written agreement they executed before the program was broadcast is unconscionable. We agree. Accordingly, we grant the petition for writ of mandate.

### FACTUAL AND PROCEDURAL BACKGROUND

Petitioners Charles, Michael, Charis, Joshua, and Jeremiah Higgins are siblings. In February 2005, when they executed the agreement whose arbitration provision is at issue, they were 21, 19, 17, 16, and 14 years old, respectively.

Real parties in interest, to whom we refer collectively as the television defendants, are (1) American Broadcasting Companies, Inc., the network that broadcasts *Extreme Makeover*; (2) Disney/ABC International Television, Inc.,

which asserts it had no involvement with the *Extreme Makeover* program in which petitioners appeared; (3) Lock and Key Productions, the show's producer; (4) Endemol USA, Inc., which is also involved in producing the program; and (5) Pardee Homes, which constructed the home featured in the *Extreme Makeover* episode in which petitioners appeared.

Petitioners' parents died in 2004. The eldest sibling, Charles, became the guardian for the then three minor children. (To avoid confusion with his siblings, we refer to Charles Higgins by his first name.) Shortly thereafter, petitioners moved in with church acquaintances, Firipeli and Lokilani Leomiti, a couple with three children of their own. The Leomitis are defendants in the litigation but are not involved in the present writ proceeding.

According to Charles, after moving in with the Leomitis, he was advised by members of his church that producers of *Extreme Makeover* had contacted the church and had asked to speak to him about the production of a show based on the loss of petitioners' parents and that petitioners were now living with the Leomitis.[1] In July or August 2004, Charles called and spoke with an associate producer of Lock and Key about the program and petitioners' living situation.

Over the next several months, there were additional contacts between petitioners and persons affiliated with the production of the program, including in-person interviews and the filming of a casting tape. By early 2005, petitioners and the Leomitis were chosen to participate in the program in which the Leomitis' home would be completely renovated.

On February 1, 2005, a Lock and Key producer sent by Federal Express to each of the petitioners and to the Leomitis an "Agreement and Release" for their signatures.[2] The Agreement and Release contains 24 single-spaced pages and 72 numbered paragraphs. Attached to it were several pages of exhibits, including an authorization for release of medical information, an emergency medical release, and, as exhibit C, a one-page document entitled "Release."

---

[1] Lock and Key's executive producer describes *Extreme Makeover* as a " 'reality' based television series" whose "premise . . . is to find needy and deserving families who live in a home which does not serve their needs. The Program takes the selected families' existing homes and land and radically improves them by demolishing and rebuilding the home."

[2] The version of the agreement intended for the three minor petitioners was slightly different than the one intended for the two adult petitioners and the Leomitis. The slight variations between the two versions are not relevant to the issue before us. In this opinion, we quote from, and cite to, the adult version.

To avoid confusion with the one-page exhibit C Release, we refer to the 24-page Agreement and Release simply as the "Agreement," and to exhibit C as the "Release."

At the top of the first page of the Agreement, the following appears in large and underlined print: "NOTE: DO NOT SIGN THIS UNTIL YOU HAVE READ IT COMPLETELY." The second-to-last numbered paragraph also states in pertinent part: "I have been given ample opportunity to read, and I have carefully read, this entire agreement. . . . I certify that I have made such an investigation of the facts pertinent to this Agreement and of all the matters pertaining thereto as I have deemed necessary . . . . I represent and warrant that I have reviewed this document with my own legal counsel prior to signing (or, IN THE ALTERNATIVE, although I have been given a reasonable opportunity to discuss this Agreement with counsel of my choice, I have voluntarily declined such opportunity)."

The last section of the Agreement, which includes 12 numbered paragraphs, is entitled "MISCELLANEOUS."[3] None of the paragraphs in that section contains a heading or title. Paragraph 69 contains the following arbitration provision: "69. I agree that any and all disputes or controversies arising under this Agreement or any of its terms, any effort by any party to enforce, interpret, construe, rescind, terminate or annul this Agreement, or any provision thereof, and any and all disputes or controversies relating to my appearance or participation in the Program, shall be resolved by binding arbitration in accordance with the following procedure . . . . All arbitration proceedings shall be conducted under the auspices of the American Arbitration Association . . . . I agree that the arbitrator's ruling, or arbitrators' ruling, as applicable, shall be final and binding and not subject to appeal or challenge. . . . The parties hereto agree that, notwithstanding the provisions of this paragraph, Producer shall have a right to injunctive or other equitable relief as provided for in California Code of Civil Procedure [section] 1281.8 or other relevant laws."

There is nothing in the Agreement that brings the reader's attention to the arbitration provision. Although a different font is used occasionally to highlight certain terms in the Agreement, that is not the case with the paragraph containing the arbitration provision.[4] Six paragraphs in the Agreement con-

---

[3] Because of an apparent typographical error, the third-to-last paragraph and the last paragraph of the Agreement are both numbered 69. Our references to paragraph 69 are to the former.

[4] Three other paragraphs in the Agreement are printed in bold and capitalized letters, substantial portions of four other paragraphs are printed in bold letters, and a few words in other paragraphs are printed in bold or capitalized letters.

tain a box for the petitioners to initial; initialing is not required for the arbitration provision.

The Agreement also contains a provision limiting petitioners' remedies for breach of the Agreement to money damages.

The one-page Release is typed in a smaller font than the Agreement. It consists of four single-spaced paragraphs, the middle of which contains the following arbitration clause: "I agree that any and all disputes or controversies arising under this Release or any of its terms, any effort by any party to enforce, interpret, construe, rescind, terminate or annul this Release, or any provision thereof, shall be resolved exclusively by binding arbitration before a single, neutral arbitrator, who shall be a retired judge of a state or federal court. All arbitration proceedings shall be conducted under the auspices of the American Arbitration Association, under its Commercial Arbitration Rules, through its Los Angeles, California office. I agree that the arbitration proceedings, testimony, discovery and documents filed in the course of such proceedings, including the fact that the arbitration is being conducted, will be treated as confidential . . . ."

There is no evidence that any discussions took place between petitioners and any representative of the television defendants regarding either the Agreement or the Release, or that any of the television defendants directly imposed any deadline by which petitioners were required to execute the documents.

On February 5, 2005, a field producer from Lock and Key and a location manager for the program went to the Leomitis' home and met with the Leomitis. Although physically present at the house, petitioners did not participate in the meeting. During the meeting, one of the Leomitis asked about the documents they had received, and the producer and location manager advised the Leomitis that they should read the documents carefully, call if they had questions, and then execute and return the documents.

According to Charles, after this meeting, the Leomitis emerged with a packet of documents, which they handed to petitioners. Mrs. Leomiti instructed petitioners to "flip through the pages and sign and initial the document where it contained a signature line or box." Charles stated that from the time Mrs. Leomiti "handed the document to us and the time we signed it, approximately five to ten minutes passed." The document contained complex legal terms that he did not understand. He did not know what an arbitration agreement was and did not understand its significance or the legal

consequences that could flow from signing it. He did not specifically state whether or not he saw the arbitration provisions contained either in paragraph 69 or the Release before he signed the documents.

Each of the petitioners executed the Agreement and signed all exhibits, including the Release.

On February 16, 2005, representatives from the show appeared and started to reconstruct the Leomitis' home. When the new home was completed, it had nine bedrooms, including one for each of the five petitioners. The existing mortgage was also paid off.

The program featuring petitioners and the Leomitis was broadcast on Easter Sunday, 2005.

Petitioners allege that, after the show was first broadcast, the Leomitis informed petitioners that the home was theirs (the Leomitis'), and the Leomitis ultimately forced petitioners to leave. Charles contacted Lock and Key's field producer and asked for help. The producer responded that he could not assist petitioners. Sometime thereafter, the *Extreme Makeover* episode was rebroadcast.

In August 2005, petitioners filed this action against the television defendants and the Leomitis. According to the record before us, the complaint includes claims for, among other things, intentional and negligent misrepresentation, breach of contract, unfair competition (Bus. & Prof. Code, § 17200 et seq.), and false advertising (Bus. & Prof. Code, § 17500 et seq.). With respect to the television defendants, the complaint appears to allege that those defendants breached promises to provide petitioners with a home, exploited petitioners, and portrayed petitioners in a false light (by rebroadcasting the episode when they knew the episode no longer reflected petitioners' living situation).

The television defendants petitioned to compel arbitration pursuant to the Federal Arbitration Act (FAA) (9 U.S.C. § 1 et seq.). The television defendants maintained that all claims against both them and the Leomitis should be arbitrated. The Leomitis joined in the petition.[5]

---

[5] The memorandum of points and authorities filed in support of the petition to compel arbitration appears to rely exclusively on the arbitration provision in the Agreement, and not on the arbitration provision in the one-page Release. Our uncertainty is caused by the fact that the legal memorandum mentions paragraph 69 on a number of occasions, makes no references to the one-page Release, yet uses the term "release," which, as we have observed, could refer to the exhibit C "Release" or the "Applicant Agreement and Release." The fact that two documents contain an arbitration provision does not affect our analysis.

Petitioners opposed the petition, claiming, among other things, that the arbitration provision was unconscionable. They claimed it was procedurally unconscionable because the parties had unequal bargaining power, the arbitration provision was "buried" in the Agreement, petitioners were given only five to 10 minutes before they were asked to sign the Agreement, none of the television defendants explained the Agreement to them, and copies of the executed documents were "withheld" from them.[6]

Petitioners also argued the Agreement was substantively unconscionable because its terms were so one-sided as to shock the conscience. They claimed the Agreement requires only them and not the television defendants to arbitrate, limits petitioners' remedies to damages (while the television defendants' remedies are not so limited), precludes only petitioners from appealing, provides that the arbitration will be in accordance with the rules of the American Arbitration Association (which unfairly requires arbitration costs to be borne equally by the parties), and allows the television defendants to change the terms of the Agreement at any time.

After argument, the trial court issued an order granting the petition in most respects, conditioned on the television defendants' paying all arbitration costs. The court denied the petition as to the claims against the Leomitis and the unfair competition and false advertising claims against the television defendants, rulings not presently challenged. The court reasoned that although petitioners "argue that the 'arbitration agreements' are enforceable [presumably the court meant 'unenforceable'], their argument is directed not at the arbitration provisions but at the releases themselves."[7] The court then cited United States and California Supreme Court decisions holding that under the FAA, where a party seeks to avoid application of an arbitration provision on the ground that the agreement in which the provision is contained is unenforceable, that claim must be considered by the arbitrator, not the court. The trial court also stated that "since defendants have shown that plaintiffs signed the releases having had an opportunity to read them, the arbitration provisions are found by this court to be enforceable." The court did not address petitioners' other specific claims of unconscionability, presumably because it construed petitioners' opposition to the petition to compel arbitration as an attack only on the entire Agreement and one-page Release, not on the arbitration provisions contained in those documents.

---

[6] There is no evidence that anyone refused to give petitioners a copy of the Agreement. The withholding claim appears to be based on the fact that petitioners did not receive an additional copy of the Agreement, either before or after signing it.

[7] The court's use of the term "releases" appears to refer to the Agreement. See footnote 5, *ante.*

Petitioners then filed this writ petition challenging the trial court's ruling. We issued an alternative writ, received additional briefing from the parties, and heard oral argument.

## DISCUSSION

A. *Unconscionability as a Defense to Enforcement of Arbitration Provisions*

■ The trial court ruled, and petitioners do not dispute, that the enforceability of the arbitration clause is governed by the FAA. Federal law applies to arbitration provisions in contracts involving interstate commerce. (See 9 U.S.C. § 2; *Cronus Investments, Inc. v. Concierge Services* (2005) 35 Cal.4th 376, 380, 383–384 [25 Cal.Rptr.3d 540, 107 P.3d 217] (*Cronus Investments*).) Numerous cases observe that arbitration is generally favored under both the FAA and California law. (E.g., *Balandran v. Labor Ready, Inc.* (2004) 124 Cal.App.4th 1522, 1527 [22 Cal.Rptr.3d 441]; *Ruiz v. Sysco Food Services* (2004) 122 Cal.App.4th 520, 538 [18 Cal.Rptr.3d 700].) At the same time, our Supreme Court has emphasized that "although we have spoken of a 'strong public policy of this state in favor of resolving disputes by arbitration' [citation], Code of Civil Procedure section 1281 makes clear that an arbitration agreement is to be rescinded on the same grounds as other contracts or contract terms. In this respect, arbitration agreements are neither favored nor disfavored, but simply placed on an equal footing with other contracts." (*Armendariz v. Foundation Health Psychcare Services, Inc.* (2000) 24 Cal.4th 83, 126–127 [99 Cal.Rptr.2d 745, 6 P.3d 669] (*Armendariz*); see also *Buckeye Check Cashing, Inc. v. Cardegna* (2006) 546 U.S. 440 [163 L.Ed.2d 1038, 1042, 126 S.Ct. 1204, 1207] (*Buckeye*) [section 2 of the FAA "embodies the national policy favoring arbitration and places arbitration agreements on equal footing with all other contracts"]; *Cronus Investments, supra,* 35 Cal.4th at p. 384 ["the FAA's purpose is not to provide special status for arbitration agreements, but only 'to make arbitration agreements as enforceable as other contracts, but not more so' "].)

■ Thus, under both the FAA and California law, "arbitration agreements are valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." (*Armendariz, supra,* 24 Cal.4th at p. 98, fn. omitted.)

■ One ground is unconscionability, the basis asserted by petitioners below and in this writ proceeding. (See *Flores v. Transamerica HomeFirst, Inc.* (2001) 93 Cal.App.4th 846, 856 [113 Cal.Rptr.2d 376].) "The ' "strong public policy of this state in favor of resolving disputes by arbitration" ' does not extend to an arbitration agreement permeated by unconscionability." (*Ibid.*) As is frequently the case with inquiries into unconscionability, our analysis begins—although it does not end—with whether the Agreement and Release are contracts of adhesion. (See *Armendariz, supra,* 24 Cal.4th at p. 113.) Petitioners contend that they are and that the arbitration provisions are unconscionable. A contract of adhesion is a standardized contract that is imposed and drafted by the party of superior bargaining strength and relegates to the other party " 'only the opportunity to adhere to the contract or reject it.' " (*Ibid.,* quoting *Neal v. State Farm Ins. Cos.* (1961) 188 Cal.App.2d 690, 694 [10 Cal.Rptr. 781].) Adhesion contracts are routine in modern day commerce, and at least one commentator has suggested they are worthy of neither praise nor condemnation, only analysis. (1 Corbin on Contracts (1993) § 1.4, p. 14.) If a court finds a contract to be adhesive, it must then determine whether " 'other factors are present which, under established legal rules— legislative or judicial—operate to render it' " unenforceable. (*Armendariz,* at p. 113, citing *Graham v. Scissor-Tail, Inc.* (1981) 28 Cal.3d 807, 820 [171 Cal.Rptr. 604, 623 P.2d 165] (*Graham*).)

■ One "established rule" is that a court need not enforce an adhesion contract that is unconscionable. (*Graham, supra,* 28 Cal.3d at p. 820.) As our Supreme Court explained in *Armendariz,* the Legislature has now codified the principle, historically developed in case law, that a court may refuse to enforce an unconscionable provision in a contract. (Civ. Code, § 1670.5.)[8] Because defenses to arbitration provisions under the FAA are on equal footing with defenses to any other contract, unconscionability is neither favored nor disfavored as a reason to refuse enforcement of an arbitration clause. (See *Doctor's Associates, Inc. v. Casarotto* (1996) 517 U.S. 681, 686–687 [134 L.Ed.2d 902, 116 S.Ct. 1652].)

Recent appellate decisions have focused more on what is unconscionable and less on what is adhesive. (See *Trend Homes, Inc. v. Superior Court* (2005) 131 Cal.App.4th 950, 958 [32 Cal.Rptr.3d 411]; *Morris v. Redwood Empire*

---

[8] Civil Code section 1670.5, subdivision (a), provides: "If the court as a matter of law finds the contract or any clause of the contract to have been unconscionable at the time it was made the court may refuse to enforce the contract, or it may enforce the remainder of the contract without the unconscionable clause, or it may so limit the application of any unconscionable clause as to avoid any unconscionable result."

*Bancorp* (2005) 128 Cal.App.4th 1305, 1318 [27 Cal.Rptr.3d 797]; *Harper v. Ultimo* (2003) 113 Cal.App.4th 1402, 1409 [7 Cal.Rptr.3d 418] ["Adhesion is not a prerequisite for unconscionability"].)

■ Unconscionability has both a procedural and a substantive element, the former focusing on "oppression" or "surprise" due to unequal bargaining power, the latter on "overly harsh" or "one-sided" results. (*Armendariz, supra,* 24 Cal.4th at p. 114.) " 'The prevailing view is that [procedural and substantive unconscionability] must *both* be present in order for a court to exercise its discretion to refuse to enforce a contract or clause under the doctrine of unconscionability.' [Citation.] But they need not be present in the same degree. 'Essentially a sliding scale is invoked which disregards the regularity of the procedural process of the contract formation, that creates the terms, in proportion to the greater harshness or unreasonableness of the substantive terms themselves.' [Citations.] In other words, the more substantively oppressive the contract term, the less evidence of procedural unconscionability is required to come to the conclusion that the term is unenforceable, and vice versa." (*Ibid.*)

Under the FAA, a court may not consider a claim that an arbitration provision is unenforceable if it is a subterfuge for a challenge that the entire agreement (in which the arbitration clause is only a part) is unconscionable. That contention must be presented to the arbitrator. (*Buckeye, supra,* 546 U.S. at pp. 446–449 [163 L.Ed.2d at pp. 1044–1046, 126 S.Ct. at pp. 1209–1210] ["regardless of whether the challenge is brought in federal or state court, a challenge to the validity of the contract as a whole, and not specifically to the arbitration clause, must go to the arbitrator"]; see *Rosenthal v. Great Western Fin. Securities Corp.* (1996) 14 Cal.4th 394, 419 [58 Cal.Rptr.2d 875, 926 P.2d 1061].) Our task, therefore, is two-fold: (1) Does the petition here challenge the enforceability of the Agreement and the Release, in toto, or does it contest only the arbitration provision? (2) If it is the latter, is the arbitration provision unconscionable?

B. *The Standard of Review*

■ The party petitioning to compel arbitration "bears the burden of proving the existence of a valid arbitration agreement by a preponderance of the evidence. The party opposing the petition must meet the same evidentiary burden to prove any facts necessary to its defense." (*Provencio v. WMA Securities, Inc.* (2005) 125 Cal.App.4th 1028, 1031 [23 Cal.Rptr.3d 524].) "[T]he party opposing arbitration . . . has the burden of proving the arbitration provision is unconscionable." (*Szetela v. Discover Bank* (2002) 97 Cal.App.4th 1094, 1099 [118 Cal.Rptr.2d 862].)

Whether an arbitration provision is unconscionable is ultimately a question of law. (*Flores v. Transamerica HomeFirst, Inc., supra*, 93 Cal.App.4th at p. 851; see also Civ. Code, § 1670.5.) Where, as here, the trial court rules on the question of unconscionability based on declarations that contain no meaningful factual disputes, we review the trial court's ruling de novo. (*Flores v. Transamerica HomeFirst, Inc.*, at p. 851; *Brookwood v. Bank of America* (1996) 45 Cal.App.4th 1667, 1670 [53 Cal.Rptr.2d 515]; *CPI Builders, Inc. v. Impco Technologies, Inc.* (2001) 94 Cal.App.4th 1167, 1171–1172 [114 Cal.Rptr.2d 851].)[9]

## C. The Trial Court Incorrectly Concluded Petitioners Were Challenging the Enforceability of the Entire Agreement and Release

The trial court offered two reasons for its decision to order arbitration. First, it concluded that petitioners' opposition to arbitration was predicated on a challenge to the Agreement as a whole, not to the arbitration provision in particular. From this premise, the trial court reasoned that, because the enforceability of the entire agreement is to be considered by the arbitrator, not the court (*Buckeye, supra*, 546 U.S. at pp. 446–449 [163 L.Ed.2d at pp. 1044–1046, 126 S.Ct. at pp. 1209–1210]), the petition should be granted. The trial court's framing of the issue was seen in its written ruling, where it stated, "Although plaintiffs argue that the 'arbitration agreements' are enforceable, their argument is directed not at the arbitration provisions but at the releases themselves." The court then provided a correct analysis of the law on the subject, citing *Prima Paint v. Flood & Conklin* (1967) 388 U.S. 395 [18 L.Ed.2d 1270, 87 S.Ct. 1801] and *Rosenthal v. Grant Western Fin. Securities Corp., supra*, 14 Cal.4th 394. The trial court concluded, "Here, plaintiffs attack the validity of the releases, not the arbitration provisions . . . ."

Although we agree with the court's legal analysis, its ultimate conclusion was flawed because petitioners' opposition to the petition was that the arbitration clause in particular, not the entire Agreement, was unconscionable. Petitioners devoted considerable attention to paragraph 69 of the Agreement, emphasizing that it "is not set out or made distinguishable in any manner. It is misidentified within the caption as 'miscellaneous.' It is not distinguished in different type font size, bold letters, capital letters, in red, and does not contain any separate waiver notice." The caption of a four-page argument made by petitioners reads: "The Arbitration Agreements Are Procedurally and

---

[9] Although the television defendants' brief suggests there are disputed facts, we do not find any; nor does the trial court's written ruling or statements made at the hearing suggest that it was resolving a factual dispute.

Substantively Unconscionable Thereby Barring Their Enforcement." And in arguing that the arbitration provision was substantively unconscionable, petitioners quoted from paragraph 69 in an effort to demonstrate that the provision was one-sided, requiring only them, and not the television defendants, to submit to arbitration. The principal thrust of petitioners' oral argument to the trial court was likewise that "the entire arbitration clause was itself one-sided. So only the plaintiffs under that clause have a duty to arbitrate."

We readily understand the potential for confusion in this area. Uncertainty can become especially pronounced when parties or courts use the term "arbitration agreement," when "arbitration clause" might be more precise. Petitioners have contributed to this confusion because in the trial court they occasionally referred to the "contract" as being unconscionable, a practice they continue in their briefing in this court, when they ask us to declare the entire Agreement unenforceable.[10] Nevertheless, they argued separately that the arbitration clause itself is unconscionable, a point the trial court did not address.

The second justification offered by the trial court for granting the television defendants' petition to compel arbitration was that petitioners had an opportunity to read the Agreement and Release before signing them. While this is factually correct and legally bears on whether the Agreement is procedurally unconscionable, no authority is cited for a supposed rule that if a party reads an agreement he or she is barred from claiming it is unconscionable. Such a rule would seriously undermine the unconscionability defense.

Given the limited scope of the trial court's ruling, we could remand to permit it to decide whether the arbitration provision is unconscionable. Instead, because the case is before us on uncontested facts and our review is de novo, we decide the legal issues in the first instance. (*Rayyis v. Superior Court* (2005) 133 Cal.App.4th 138, 150 [35 Cal.Rptr.3d 12].)

D. *The Arbitration Provision Is Unconscionable*

 1. *The Adhesive Nature of the Parties' Agreement*

We begin with whether the parties' agreement was adhesive. (See *Armendariz, supra,* 24 Cal.4th at p. 113.) As discussed above, " '[t]he term [contract of adhesion] signifies a standardized contract, which, imposed and

---

[10] We decline petitioners' request.

drafted by the party of superior bargaining strength, relegates to the subscribing party only the opportunity to adhere to the contract or reject it.' " (*Ibid.*)

In this case, it is undisputed that the lengthy Agreement was drafted by the television defendants. It is a standardized contract; none of the petitioners' names or other identifying information is included in the body of the document. There is no serious doubt that the television defendants had far more bargaining power than petitioners.

The remaining question is whether petitioners were relegated only to signing or rejecting the Agreement. The television defendants note that there is no evidence petitioners were told they could not negotiate any terms of the Agreement or that petitioners made any attempt to do so. Although literally correct, the uncontested evidence was that on the day petitioners signed the Agreement the television defendants initially met with the Leomitis alone. Inferentially, at the television defendants' urging, immediately after the meeting concluded, the Leomitis gave the Agreement and exhibits to petitioners with directions to "flip through the pages and sign." The documents were returned in five to 10 minutes. One of the producers testified that he told the Leomitis "that these agreements must be executed as a condition to their further participation in the program."

From these facts, we conclude the Agreement was presented to petitioners on a take-it-or-leave-it basis by the party with the superior bargaining position who was not willing to engage in negotiations. Accordingly, we conclude the Agreement and exhibits constitute a contract of adhesion.

### 2. *Procedural Unconscionability*

"Procedural unconscionability focuses on the factors of surprise and oppression [citations], with surprise being a function of the disappointed reasonable expectations of the weaker party." (*Harper v. Ultimo, supra,* 113 Cal.App.4th at p. 1406.)

In this case, the arbitration provision appears in one paragraph near the end of a lengthy, single-spaced document. The entire agreement was drafted by the television defendants, who transmitted copies of it to the petitioners. The television defendants knew petitioners were young and unsophisticated, and had recently lost both parents. Indeed, it was petitioners' vulnerability that made them so attractive to the television defendants. The latter made no effort to highlight the presence of the arbitration provision in the Agreement. It was one of 12 numbered paragraphs in a section entitled "MISCELLANEOUS." In contrast to several other paragraphs, no text in the arbitration provision is highlighted. No words are printed in bold letters or larger font; nor are they

capitalized. Although petitioners were required to place their initials in boxes adjacent to six other paragraphs, no box appeared next to the arbitration provision.

It is true that the top of the first page advises petitioners to read the entire agreement before signing it and the second-to-last paragraph states that the person signing acknowledges doing so. This language, although relevant to our inquiry, does not defeat the otherwise strong showing of procedural unconscionability.

We now turn to substantive unconscionability, utilizing our Supreme Court's sliding scale approach. (See *Armendariz, supra,* 24 Cal.4th at p. 114.) Procedural and substantive unconscionability "need not be present in the same degree. 'Essentially a sliding scale is invoked which disregards the regularity of the procedural process of the contract formation, that creates the terms, in proportion to the greater harshness or unreasonableness of the substantive terms themselves.' [Citations.]" (*Ibid.*)

### 3. *Substantive Unconscionability*

"Substantively unconscionable terms may 'generally be described as unfairly one-sided.' [Citation.] For example, an agreement may lack 'a modicum of bilaterality' and therefore be unconscionable if the agreement requires 'arbitration only for the claims of the weaker party but a choice of forums for the claims of the stronger party.' " (*Fitz v. NCR Corp.* (2004) 118 Cal.App.4th 702, 713 [13 Cal.Rptr.3d 88], quoting *Armendariz, supra,* 24 Cal.4th at p. 119.)

In this case, the arbitration provision requires only petitioners to submit their claims to arbitration. The clause repeatedly includes "I agree" language, with the "I" being a reference to the "applicant" (i.e., each of the petitioners). The only time the phrase "the parties" is used is in the last sentence, where "the parties" agree that, notwithstanding the arbitration provision, the producer has the right to seek injunctive or other equitable relief in a court of law as provided for in Code of Civil Procedure section 1281.1 or other relevant laws.

The television defendants claim that the arbitration provision is bilateral, because "all disputes or controversies arising under this Agreement or any of its terms, any effort by any party to enforce . . . this Agreement . . . and any and all disputes or controversies relating to my appearance or participation in the Program, shall be resolved by binding arbitration." (¶ 69.) Thus, "all

disputes" are subject to arbitration, and either side may move to compel. But they miss the point: only one side (petitioners) agreed to that clause.[11]

The television defendants also assert that their contractual right to seek injunctive relief shows that they are required to arbitrate since, ordinarily, a party may seek injunctive relief as a matter of civil law. The provision would be meaningless, they argue, if the television defendants were not required to submit their claims to arbitration. We disagree. Under the arbitration provision, the television defendants (though not petitioners) can *compel* arbitration. The injunction clause is significant because the television defendants can compel arbitration without fearing that doing so would preclude them from seeking injunctive or other equitable relief in a court of record.[12]

██ Additional elements of substantive unconscionability are found in the provision barring only petitioners from seeking appellate review of the arbitrator's decision and, at least insofar as it could impact petitioners' statutory claims, the provision requiring arbitration in accordance with the rules of the American Arbitration Association, which provide that arbitration costs are to be borne equally by the parties. (See *Boghos v. Certain Underwriters at Lloyd's of London* (2005) 36 Cal.4th 495, 505–508 [30 Cal.Rptr.3d 787, 115 P.3d 68]; *Independent Assn. of Mailbox Center Owners, Inc. v. Superior Court* (2005) 133 Cal.App.4th 396, 414–417 [34 Cal.Rptr.3d 659].)[13] The harsh, one-sided nature of the arbitration provision, combined with the elements of procedural unconscionability earlier discussed, leads us to conclude that the arbitration provision is unconscionable and, therefore, unenforceable.[14] Accordingly, it was error for the trial court to have granted the petition to compel arbitration.

---

[11] Interestingly, petitioners claim the television defendants did not even sign the Agreement until after the motion to compel arbitration was filed, a point not disputed by the television defendants.

[12] The fact that the injunction provision is one-sided does not necessarily mean that the clause is substantively unconscionable. A "contracting party with superior bargaining strength may provide 'extra protection' for itself within the terms of the arbitration agreement if 'business realities' create a special need for the advantage. [Citation.] The 'business realities,' creating the special need, must be explained in the terms of the contract or factually established." (*Fitz v. NCR Corp., supra,* 118 Cal.App.4th at p. 723.) We observe that although the television defendants explained why it was important to deny petitioners injunctive relief, they did not attempt to explain why they needed such remedy.

[13] As noted above, the trial court shifted all arbitration costs to the television defendants. (See *Gutierrez v. Autowest, Inc.* (2003) 114 Cal.App.4th 77, 92–93 [7 Cal.Rptr.3d 267] [unconscionable requirement for payment of arbitration costs may be severed].)

[14] We disagree with petitioners' argument that the producer's right to change program rules unilaterally means the arbitration agreement is not bilateral. There is nothing to suggest a change in how the program is structured materially affects the parties' arbitration rights and duties.

## DISPOSITION

The petition for writ of mandate is granted. The respondent court is directed to vacate that part of its December 1, 2005 order granting the petition of the television defendants to compel arbitration and staying certain claims, and to thereafter enter a new and different order denying the petition to compel arbitration. Petitioners are entitled to recover their costs in this writ proceeding. (Cal. Rules of Court, rule 56(*l*)(1).)

Cooper, P. J., and Boland, J., concurred.

On July 10, 2006, the opinion was modified to read as printed above.