Filed 6/4/13

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| JORGE A. VARGAS et al., | B237257 |
| Plaintiffs and Appellants, | (Los Angeles County Super. Ct. No. BC452879) |
| v. | |
| SAI MONROVIA B, INC., et al., | |
| Defendants and Respondents. | |

APPEAL from an order of the Superior Court of Los Angeles County, Richard E. Rico, Judge. Reversed with directions.

Rosner, Barry & Babbitt, Hallen D. Rosner, Christopher P. Barry and Angela J. Smith for Plaintiffs and Appellants.

Arent Fox, Aaron H. Jacoby, Christian J. Scali, Victor P. Danhi; The Scali Law Firm and Christian J. Scali for Defendants and Respondents.

_____

In this appeal, we revisit our holding in *Sanchez v. Valencia Holding Co., LLC* (2012) 201 Cal.App.4th 74 (*Sanchez*), review granted March 21, 2012, S199119, that a "Retail Installment Sale Contract" used to purchase an automobile is unconscionable and unenforceable. Having considered the decisions of other California appellate courts handed down after *Sanchez*, we have refined our analysis and again conclude that the identical sale contract does not require the arbitration of disputes between a purchaser and a car dealer because it is permeated by unconscionability.

# I

# BACKGROUND

The allegations and facts in this appeal are taken from the pleadings and the exhibits submitted in connection with the motion to compel arbitration.

## A. Complaint

Plaintiffs, Jorge Vargas and Guadalupe Carcamo, filed this putative class action on January 12, 2011. Two months later, plaintiffs filed a first amended complaint (complaint), which alleged as follows.

On or about September 20, 2008, plaintiffs went to the automobile dealership owned by defendant SAI Monrovia B, Inc., doing business as Assael BMW Mini of Monrovia (Assael BMW). Plaintiffs were interested in buying a new Mini Cooper S. A salesman, "Roger," showed them a 2008 model on the lot. Plaintiffs completed a credit application to obtain financing. As required by law (Civ. Code, § 2981.9), plaintiffs should have been given a copy of the signed credit application, but Assael BMW did not give them one. Plaintiff Vargas took the car for a test drive. Upon returning to the dealership, plaintiffs told Roger they were interested in purchasing the car. In response to plaintiffs' inquiries about financing, Roger told them that to keep their monthly payments below $500, they would have to make a down payment of $1,500, and the loan would have to be for a term of six years. Because the finance office had closed for the day, Roger told plaintiffs to return the following day to complete the paperwork.

2

On September 21, 2008, plaintiffs returned to Assael BMW. Roger introduced them to one of the dealership's finance managers. During discussions with the manager, plaintiffs agreed to purchase an extended warranty, otherwise known as a service contract, for $1,845. Plaintiffs gave the manager $1,500 in cash as a down payment.

The manager presented plaintiffs with a "Retail Installment Sale Contract" (Sale Contract), which was a preprinted document consisting of *one page*, 8½ inches wide and 26 inches long. There were numerous and extensive provisions on *both* sides of the Sale Contract, leaving little in the way of margins. Plaintiffs signed or initialed the *front* side in 12 places, each relating to a different provision. No signatures or initials of the buyers were required on the *back*; there were no places on the *back* for the buyers to initial or sign. The arbitration provision, entitled, "**ARBITRATION CLAUSE**," was on the *back* at the bottom of the page, outlined by a black box; the arbitration provision was the *last* provision in the Sale Contract concerning the purchase of the vehicle; a provision related to the assignment of the contract appeared below it. The buyers' *final* signatures appeared near the bottom of the *front* side. The only signature line on the *back* was at the very bottom of the page; it required the *seller's* signature to assign the contract to a third party. The Sale Contract was written by The Reynolds and Reynolds Company and, in this case, was designated Form No. 553-CA-ARB, effective May 2008.

The Sale Contract listed the price of the car as $25,900, the amount financed as $28,721.04, the monthly payments as $492.47, the term of the loan as 72 months, and an annual percentage rate of 7.10 percent. The Sale Contract listed a charge of $8.75 for "California Tire Fees" and a charge of $28 for "Optional DMV Electronic Filing Fee." Assael BMW was required by law to charge plaintiffs $1.75 for each new tire purchased (see Pub. Resources Code, § 42885, subds. (b)(1), (d)); it unlawfully charged them for five new tires when the car had only four (see *id.*, subd. (e)). Further, Assael BMW did not discuss the electronic filing fee with either plaintiff or tell them it was optional. If plaintiffs had been so informed, they would have declined to pay the fee. In addition, Assael BMW did not provide plaintiffs with a disclosure statement showing them what

their monthly payments would be with and without the service contract, violating applicable law (see Civ. Code, § 2982.2).

At some point after September 21, 2008, Assael BMW assigned the Sale Contract to Chase Auto Finance Corporation (Chase).

Shortly after purchasing the car, plaintiffs experienced problems with it, including an intermittently inoperable window, inoperable headlamps, a repeatedly illuminated "check engine light," sluggish acceleration, poor gas mileage, and a "knocking noise." Plaintiffs took the car to Assael BMW to be repaired, but the dealer did not correct the problems. Plaintiff Carcamo then contacted BMW of North America, LLC, and complained about Assael BMW's failure to fix the car. Notwithstanding plaintiffs' efforts, the car was never fixed.

The complaint contained nine causes of action, alleging violations of the Consumers Legal Remedies Act (CLRA) (Civ. Code, §§ 1750–1784), the Automobile Sales Finance Act (Civ. Code, §§ 2981–2984.6), the California Unfair Competition Law (UCL) (Bus. & Prof. Code, §§ 17200–17210), the Song-Beverly Consumer Warranty Act (Song-Beverly Act) (Civ. Code, §§ 1790–1795.8), and the California Tire Recycling Act (Tire Recycling Act) (Pub. Resources Code, §§ 42860–42895).[1] Some of the causes of action were brought against only Assael BMW; some were brought against Assael BMW and Chase; and the last cause of action, for violation of the Song-Beverly Act, was brought against both Assael BMW and BMW of North America, LLC. Plaintiffs sought injunctive relief for violations of the CLRA and the UCL. Under the heading, "CLASS ALLEGATIONS," plaintiffs alleged that their causes of action satisfied the class action requirements of numerosity, predominate questions of law and fact, typicality, superiority

---

[1] The Tire Recycling Act requires that a person buying a *new* tire pay a fee of $1.75 per tire. If the seller of the tires knowingly makes a false statement as to the number of new tires being sold, the seller may be liable for a civil penalty not to exceed $25,000. (Pub. Resources Code, § 42885, subds. (b)(1), (e).)

of a class action over individual actions, and adequate class representation. At the end of the complaint, the prayer requested actual damages, restitution, punitive damages, and prejudgment interest, among other remedies. Plaintiffs also sought an award of attorney fees.

**B.        Motion to Compel Arbitration**

On or about July 1, 2011, Assael BMW and JP Morgan Chase Bank, N.A. (erroneously sued as Chase), filed a motion to compel arbitration pursuant to the arbitration provision in the Sale Contract. As used in the arbitration provision, "you" referred to the buyer or cobuyers, and "we" or "us" referred to the seller. The provision stated: "1. Either you or we may choose to have any dispute between us decided by arbitration and not in court or by jury trial.

"2. If a dispute is arbitrated, you will give up your right to participate as a class representative or class member on any class claim you may have against us including any right to class arbitration or any consolidation of individual arbitrations.

"3. Discovery and rights to appeal in arbitration are generally more limited than in a lawsuit, and other rights that you and we would have in court may not be available in arbitration.

"Any claim or dispute, whether in contract, tort, statute or otherwise (including the interpretation and scope of this Arbitration Clause, and the arbitrability of the claim or dispute), between you and us or our employees, agents, successors or assigns, which arises out of or relates to your credit application, purchase or condition of this vehicle, this contract or any resulting transaction or relationship . . . shall, at your or our election, be resolved by neutral, binding arbitration and not by a court action. . . . Any claim or dispute is to be arbitrated *by a single arbitrator on an individual basis and not as a class action*. You expressly *waive* any right you may have *to arbitrate a class action*. You may choose one of the following arbitration organizations and its applicable rules:  the *National Arbitration Forum . . .* (www.arbforum.com), the *American Arbitration*

5

*Association . . .* (www.adr.org), or any other organization that you may choose subject to our approval. . . .[2]

"Arbitrators shall be attorneys or retired judges and shall be selected pursuant to the applicable rules. The arbitrator shall apply governing substantive law in making an award. The arbitration hearing shall be conducted in the federal district in which you reside . . . . We will advance your filing, administration, service or case management fee and your arbitrator or hearing fee all up to a maximum of $2500, which may be reimbursed by decision of the arbitrator at the arbitrator's discretion. Each party shall be responsible for its own attorney, expert and other fees, unless awarded by the arbitrator under applicable law. *If the chosen arbitration organization's rules conflict with this Arbitration Clause, then the provisions of this Arbitration Clause shall control.* The arbitrator's award shall be final and binding on all parties, except that in the event the arbitrator's award *for a party is $0* or *against a party is in excess of $100,000*, or includes an award of *injunctive relief against a party*, that party may request *a new arbitration under the rules of the arbitration organization by a three-arbitrator panel. The appealing party* requesting new arbitration shall be responsible for *the filing fee and other arbitration costs subject to a final determination by the arbitrators of a fair apportionment of costs.* Any arbitration under this Arbitration Clause shall be governed by the Federal Arbitration Act (9 U.S.C. § 1 et seq.) and not by any state law concerning arbitration.

---

[2] The National Arbitration Forum (NAF), one of the two arbitration organizations named in the Sale Contract, stopped accepting consumer disputes in July 2009. (See NAF, File A Claim <http://www.arbforum.com/main.aspx?itemID=1529&hideBar= False&navID=175&news=3> [as of June 4, 2013]; American Bar Association, Litigation News, Future of Mandatory Arbitration of Consumer Disputes in Doubt (Aug. 19, 2009) <http://apps.americanbar.org/litigation/litigationnews/top_stories/arbitration-consumer-disputes.html> [as of June 4, 2013].)

"You and we retain any rights to *self-help remedies, such as repossession*. You and we retain the right to seek remedies in small claims court for disputes or claims within that court's jurisdiction, unless such action is transferred, removed or appealed to a different court. Neither you nor we waive the right to arbitrate by using self-help remedies or filing suit. Any court having jurisdiction may enter judgment on the arbitrator's award. This Arbitration Clause shall survive any termination, payoff or transfer of this contract. If any part of this Arbitration Clause, other than waivers of class action rights, is deemed or found to be unenforceable for any reason, the remainder shall remain enforceable. *If a waiver of class action rights is deemed or found to be unenforceable for any reason in a case in which class action allegations have been made, the remainder of this Arbitration Clause shall be unenforceable*." (Italics added, some capitalization omitted.)

Assael BMW and JP Morgan Chase Bank (collectively Assael BMW) argued in their memorandum of points and authorities that the class action waiver in the Sale Contract was valid, the arbitration provision covered all of plaintiffs' causes of action, and the suit should be stayed pending the issuance of an arbitration award.

In their opposition papers, plaintiffs asserted that the arbitration provision was procedurally and substantively unconscionable and should not be enforced. In the alternative, they argued that the CLRA entitled them to maintain a class action. More specifically, as stated in the CLRA, a consumer may "bring an action on behalf of himself and such other consumers to recover damages or obtain other relief as provided for [under the CLRA, and] . . . [¶] . . . [t]he court shall permit the suit to be maintained on behalf of all members of the represented class if [certain] conditions exist." (Civ. Code, § 1781, subds. (a)–(b).) The CLRA also provides: "Any waiver by a consumer of the provisions of this title is contrary to public policy and shall be unenforceable and void." (*Id.*, § 1751; see *Fisher v. DCH Temecula Imports, LLC* (2010) 187 Cal.App.4th 601, 613–617 [CLRA entitles consumers to maintain class actions and is not preempted by Federal Arbitration Act].) Plaintiffs claimed that the CLRA invalidated the class action waiver in the Sale Contract and that pursuant to the "poison pill" clause in the contract—

7

stating that the entire arbitration provision "shall be unenforceable" if the class action waiver is found unenforceable—plaintiffs were entitled to have all of their causes of action heard in a judicial forum.

Plaintiffs Vargas and Carcamo submitted virtually identical declarations. For example, Vargas's declaration stated: ". . . When Ms. Carcamo and I signed a sale contract for the Mini Cooper, we were presented with a stack of documents, and were simply told by Assael BMW's employee where to sign and/or initial each one. All of the documents (including the purchase contract) were pre-printed form documents. When we signed the documents, we were not given an opportunity to negotiate any of the pre-printed terms. The documents were presented to us on a take-it-or-leave-it basis. The documents (including the purchase contract) were given to us and we were simply told 'sign here' in various places. There was no question of choice on our part or of our being able to 'negotiate' anything. I did not even realize the contract had a second, back side with additional terms. I had no reason to suspect that hidden on the back of the form was a section that prohibited us from being able to sue in court if we had a problem.

". . . When we signed the purchase contract and related documents, Assael BMW did not ask us if we were willing to arbitrate any disputes with it or its assignees. Assael BMW did not tell us that there was an 'arbitration clause' on the back side of the purchase contract, and I did not see any such clause before I signed the documents. Assael BMW did not explain to us what an arbitration clause or agreement was. We were not given any opportunity at any time during our transaction with Assael BMW to negotiate whether or not we would agree to arbitrate any potential disputes, or any of the terms by which we would agree to arbitrate any disputes. We were never given an option whether to sign a contract with an arbitration clause or one without. . . .

". . . At no point during our interactions with Assael BMW were we presented with a separate arbitration agreement to review and sign. No one at Assael BMW turned the sale contract over to show me and Ms. Carcamo the writing on the back or asked us to sign any sections on the back of the contract where Assael BMW apparently now says an

8

arbitration clause is located. I was not aware there was a clause in the sale contract supposedly requiring me to arbitrate any disputes.

"... Prior to the filing of Defendants' motion [to compel arbitration], I had never heard of the National Arbitration Forum or American Arbitration Association. When Ms. Carcamo and I were at Assael BMW to sign the sale contract, we did not have, nor were we given, an opportunity to use a computer to download any information about these or any other arbitration organizations, including their procedures or rules. Nor was I aware we could have or should have done this."

On or about August 15, 2011, Assael BMW filed a motion to strike the class allegations in the complaint on the ground that the Sale Contract precluded a class action. The motion to strike was set for hearing on the same day as the motion to compel arbitration. Plaintiffs filed opposition to the motion to strike.

The motions to compel arbitration and to strike the class allegations were heard on September 13, 2011. By order of the same date, the trial court granted the motion to compel arbitration as to the first eight of the nine causes of action. The court denied the motion to compel as to the ninth cause of action, which alleged a violation of the Song-Beverly Act, because BMW of North America, LLC, was a defendant on that cause of action but was not a party to the Sale Contract and thus not subject to arbitration. The trial court also granted the motion to strike the class action allegations in the complaint. Plaintiffs appealed.[3]

---

[3] Because the trial court compelled arbitration of plaintiffs' causes of action on an individual—not a class—basis and also struck the class allegations in the complaint, the trial court's order is reviewable under the "death knell" doctrine. (See *Franco v. Athens Disposal Co., Inc.* (2009) 171 Cal.App.4th 1277, 1288; *In re Baycol Cases I & II* (2011) 51 Cal.4th 751, 756–758.)

9

## II

## DISCUSSION

"'"'Whether an arbitration provision is unconscionable is ultimately a question of law.'" . . . 'On appeal, when the extrinsic evidence is undisputed, as it is here, we review the contract de novo to determine unconscionability.'" (*Suh v. Superior Court* (2010) 181 Cal.App.4th 1504, 1511–1512, citations omitted; accord, *Mercuro v. Superior Court* (2002) 96 Cal.App.4th 167, 174.) Because this appeal presents a question of law, we may resolve it in the first instance, without remand to the trial court. "'We are not bound by the trial court's stated reasons, if any, supporting its ruling . . . .'" (*Walgreen Co. v. City and County of San Francisco* (2010) 185 Cal.App.4th 424, 433.)

The parties disagree as to whether the class action waiver is unenforceable under the CLRA, thereby making the entire arbitration provision unenforceable in accordance with the poison pill clause. They also dispute whether the arbitration provision is procedurally and substantively unconscionable and whether the provision is permeated by unconscionability, rendering it unenforceable. (For convenience, our use of "Assael BMW, "car dealer," "dealership," or any similar term includes the assignee, JP Morgan Chase Bank, N.A.)

We do not address whether the class action waiver is unenforceable under the CLRA and the poison pill clause. Rather, we conclude the arbitration provision as a whole is unconscionable: The provision is procedurally unconscionable because it is adhesive and satisfies the elements of oppression and surprise; it is substantively unconscionable because it contains overly harsh terms that favor the car dealer to the detriment of the buyer. Because the provision contains multiple invalid clauses, it is permeated by unconscionability and unenforceable. Severance of the offending language is not appropriate. It follows that the case should be heard in a court of law.

## A.     General Principles of Unconscionability

"In 1979, the Legislature enacted Civil Code section 1670.5, which codified the principle that a court can refuse to enforce an unconscionable provision in a contract. . . . As section 1670.5, subdivision (a) states: 'If the court as a matter of law finds the

10

contract or any clause of the contract to have been unconscionable at the time it was made the court may refuse to enforce the contract, or it may enforce the remainder of the contract without the unconscionable clause, or it may so limit the application of any unconscionable clause as to avoid any unconscionable result.' Because unconscionability is a reason for refusing to enforce contracts generally, it is also a valid reason for refusing to enforce an arbitration agreement under [the California Arbitration Act (Code Civ. Proc., §§ 1280–1294.2)], which . . . provides that arbitration agreements are 'valid, enforceable and irrevocable, save upon such grounds as exist for the revocation of any contract' [(*id.*, § 1281)]. The United States Supreme Court, in interpreting the same language found in section 2 of the [Federal Arbitration Act] (9 U.S.C. § 2), recognized that 'generally applicable contract defenses, such as fraud, duress, or *unconscionability*, may be applied to invalidate arbitration agreements . . . .'" (*Armendariz v. Foundation Health Psychcare Services, Inc.* (2000) 24 Cal.4th 83, 114 (*Armendariz*), citation omitted.)

"'[G]enerally applicable contract defenses, such as . . . unconscionability, may be applied to invalidate arbitration agreements without contravening' the [Federal Arbitration Act]. . . . Unconscionability consists of both procedural and substantive elements. The procedural element addresses the circumstances of contract negotiation and formation, focusing on oppression or surprise due to unequal bargaining power. . . . Substantive unconscionability pertains to the fairness of an agreement's actual terms and to assessments of whether they are overly harsh or one-sided. . . . A contract term is not substantively unconscionable when it merely gives one side a greater benefit; rather, the term must be 'so one-sided as to "shock the conscience."'" (*Pinnacle Museum Tower Assn. v. Pinnacle Market Development (US), LLC* (2012) 55 Cal.4th 223, 246, citations omitted.)

"The party resisting arbitration bears the burden of proving unconscionability. . . . Both procedural unconscionability and substantive unconscionability must be shown, but 'they need not be present in the same degree' and are evaluated on '"a sliding scale."' . . . '[T]he more substantively oppressive the contract term, the less evidence of procedural

11

unconscionability is required to come to the conclusion that the term is unenforceable, and vice versa.'" (*Pinnacle Museum Tower Assn. v. Pinnacle Market Development (US), LLC*, *supra*, 55 Cal.4th at p. 247, citations omitted.)

In applying the foregoing principles, we necessarily reject Assael BMW's contention that *AT&T Mobility LLC v. Concepcion* (2011) 563 U.S. ___ [131 S.Ct. 1740] (*Concepcion*) precludes a court from relying on unconscionability as a ground for invalidating an arbitration provision. *Concepcion* does not foreclose our analysis for three reasons. First, our Supreme Court's decision in *Pinnacle*, which was handed down more than a year after *Concepcion*, applied California's traditional unconscionability principles in concluding that an arbitration provision governing a condominium complex was not unconscionable. Second, *Concepcion* itself recognized the continuing validity of the doctrine of unconscionability as a basis for declaring an arbitration agreement unenforceable. (*Concepcion*, at p. 1746.) Third, the California Courts of Appeal have recognized that "*Concepcion* did not eliminate state law unconscionability as a defense to the enforcement of arbitration agreements subject to the Federal Arbitration Act." (*Sparks v. Vista Del Mar Child and Family Services* (2012) 207 Cal.App.4th 1511, 1519; accord, *Nelsen v. Legacy Partners Residential, Inc.* (2012) 207 Cal.App.4th 1115, 1123–1126; *Samaniego v. Empire Today, LLC* (2012) 205 Cal.App.4th 1138, 1141, 1150.)

In *Concepcion*, the court held that, under the Federal Arbitration Act, a state may not rely on *categorical* rules that prohibit the arbitration of a *particular type of claim*. (*Concepcion*, *supra*, 131 S.Ct. at pp. 1746, 1750; see *Cruz v. Cingular Wireless, LLC* (11th Cir. 2011) 648 F.3d 1205, 1211; *Brewer v. Missouri Title Loans* (Mo. 2012) 364 S.W.3d 486, 489; see also *Marmet Health Care Center v. Brown* (2012) 565 U.S. ___ [132 S.Ct. 1201, 1203–1204].) California's traditional principles of unconscionability do not constitute a categorical rule invalidating arbitration agreements. On the contrary, the doctrine of unconscionability requires courts to determine whether, in the formation of a contract, there are elements of oppression or surprise due to unequal bargaining power and whether the terms of the contract are overly harsh or one-sided. (See *Pinnacle Museum Tower Assn. v. Pinnacle Market Development (US), LLC*, *supra*,

12

55 Cal.4th at p. 246.)  Unlike the rule in *Discover Bank v. Superior Court* (2005) 36 Cal.4th 148, which constituted a categorical rule against class action waivers in consumer contracts and was therefore inconsistent with the Federal Arbitration Act (see *Concepcion*, at pp. 1747, 1750), the principles we apply today are arbitration neutral and thus do not stand as an obstacle to the purposes of the Federal Arbitration Act.  (See generally Gilles & Friedman, *After Class:  Aggregate Litigation in the Wake of* AT&T Mobility v. Concepcion (2012) 79 U.Chi. L.Rev. 623, 647–648, 650–651; Note, *There Is Still Hope For The Little Guy:  Unconscionability Is Still A Defense Against Arbitration Clauses Despite* AT&T v. Concepcion (2012) 33 Whittier L.Rev. 651, 663.)[4]

## B.      Procedural Unconscionability

"As indicated, procedural unconscionability requires oppression or surprise. '"Oppression occurs where a contract involves lack of negotiation and meaningful choice, surprise where the allegedly unconscionable provision is hidden within a prolix printed form."'"  (*Pinnacle Museum Tower Assn. v. Pinnacle Market Development (US), LLC*, *supra*, 55 Cal.4th at p. 247.)

In *Gutierrez v. Autowest, Inc.* (2003) 114 Cal.App.4th 77 (*Gutierrez*), the plaintiff leased a vehicle pursuant to a contract virtually identical to the one here and signed it under similar circumstances.  The Court of Appeal had no difficulty concluding the arbitration provision was procedurally unconscionable, saying:  "The trial court's implicit

---

[4] After we filed *Sanchez*, other Courts of Appeal addressed whether the Sale Contract is unconscionable, including *Goodridge v. KDF Automotive Group, Inc.* (2012) 209 Cal.App.4th 325, review granted and briefing deferred December 19, 2012, S206153; *Flores v. West Covina Auto Group, LLC* (2013) 212 Cal.App.4th 895, review granted and briefing deferred April 10, 2013, S208716; *Natalini v. Import Motors, Inc.* (2013) 213 Cal.App.4th 587, review granted and briefing deferred May 1, 2013, S209324; and *Vasquez v. Greene Motors, Inc*. (2013) 214 Cal.App.4th 1172, petition for review pending, petition filed May 3, 2013, S210439.  In *Goodridge* and *Natalini*, the Courts of Appeal concluded the Sale Contract was unconscionable.  In *Flores* and *Vasquez*, the Courts of Appeal reached the opposite conclusion.

13

conclusion that the arbitration clause in the automobile lease is adhesive is supported by substantial evidence. The lease was presented to plaintiffs for signature on a 'take it or leave it' basis. Plaintiffs were given no opportunity to negotiate any of the preprinted terms in the lease. The arbitration clause was particularly inconspicuous, printed in eight-point typeface on the opposite side of the signature page of the lease. [The plaintiff] was never informed that the lease contained an arbitration clause, much less offered an opportunity to negotiate its inclusion within the lease or to agree upon its specific terms. He was not required to initial the arbitration clause. . . . He either had to accept the arbitration clause and the other preprinted terms, or reject the lease entirely. Under these circumstances, the arbitration clause was procedurally unconscionable." (*Id.* at p. 89, citation omitted; accord, *Fittante v. Palm Springs Motors, Inc.* (2003) 105 Cal.App.4th 708, 722–723.)

Even the California Attorney General has commented that the lengthy one-page Sale Contract is problematic, describing it as "an unwieldy size for a business document, and incompatible with standard office printing and reproduction machines. This incompatibility leads to significant trouble and expense for automobile dealers, as well as for those consumers who need to make or transmit copies of their sales contracts." (92 Ops.Cal.Atty.Gen. 97, 98 (2009).) The Attorney General has advised that a Sale Contract need not be a single page but may consist of multiple pages fastened together and sequentially numbered. (*Id.* at pp. 100–101.) As the Attorney General explained, the use of multiple pages, as opposed to a single page, will "facilitat[e] . . . *the consumer's review of all of the parties' agreements before the consumer signs the sale or lease contract, so that the consumer has complete and accurate information*. The [multiple-page] rule also helps to avert later disputes *about the terms of the parties' final agreement*." (*Id.* at p. 100, italics added.)

We realize that the Sale Contract was drafted as a single two-sided page in an attempt to comply with the Automobile Sales Finance Act, which states in part: "Every conditional sale contract subject to this chapter shall be in writing and, if printed, shall be printed in type no smaller than 6-point, and shall contain in *a single document* all of the

14

agreements of the buyer and seller with respect to the total cost and the terms of payment for the motor vehicle, including any promissory notes or any other evidences of indebtedness." (Civ. Code, § 2981.9, italics added.) But nothing in the act, regardless of how it is interpreted, required that the arbitration provision be placed on the *back* of the page, that all of the buyer's initials and signatures be placed on the *front*, or that, in this case, the finance manager instruct the buyers where to initial and sign the Sale Contract on the *front* without letting them read *any* of the contract's provisions or see that the contract had provisions on the *back*.

Assael BMW emphasizes that, on the front side of the Sale Contract, plaintiffs placed their signatures near a provision stating: "You agree to the terms of this contract. You confirm that before you signed this contract, we gave it to you, and you were free to take it and review it. You *acknowledge that you have read both sides of this contract, including the **arbitration clause** on the reverse side*, before signing below. You confirm that you received a completely filled-in copy when you signed it." (Capitalization omitted, italics & boldface added.) This "acknowledgement" provision was located 22 inches from the top of the page, on the front side, and flush to the *right margin* in a space measuring about two inches wide and one inch high. To the immediate left of the provision was boxed text discussing the lack of a cooling-off period; the boxed text was approximately six inches wide and one inch high. A sentence appeared above *both* the acknowledgement provision and the cooling-off provision; it stated, in boldface and larger font: "**The Annual Percentage Rate may be negotiable with the Seller. The Seller may assign this contract and retain its right to receive a part of the Finance Charge.**" And the signature line for the buyer appeared flush to the *left* margin under the boxed text discussing the lack of a cooling-off period, not under the provision referring to the "arbitration clause on the reverse side." In short, the provision on the *front* side stating that the buyers had read the "arbitration clause on the reverse side" was obscured by the surrounding text.

Spacing and format aside, plaintiffs stated in their declarations that the finance manager instructed them where to sign or initial the Sale Contract—telling them "'sign

15

here' in various places"—and he did not turn the contract over, which would have revealed the arbitration provision. The finance manager controlled the presentation and the signing of the purchase documents, including the Sale Contract. If Assael BMW had wanted plaintiffs to read the Sale Contract, it would have given them the contract and told them to initial or sign in the appropriate places as they read the document. Instead, by having the finance manager point to various blank lines and tell plaintiffs to "sign here," Assael BMW deprived plaintiffs of an opportunity to read the Sale Contract. As a result, plaintiffs did not know the contract contained an arbitration provision; they did not see the two-word reference—"arbitration clause"—on the front side, nor did they see the arbitration provision or any other provision on the back. As one Court of Appeal has explained in analogous circumstances: "[P]laintiffs are claiming that they never knowingly agreed to the arbitration provision[]. As in most, if not all, adhesion contract cases, they deny ever reading [it]. The general rule '"that one who signs an instrument may not avoid the impact of its terms on the ground that he failed to read the instrument before signing it"' applies only in the absence of '"overreaching"' . . . or '"'imposition'"' . . . . Thus, *it does not apply to an adhesion contract*. . . . Indeed, *failure to read the contract helps 'establish actual surprise . . . .'*" (*Bruni v. Didion* (2008) 160 Cal.App.4th 1272, 1290–1291, citations omitted, italics added; accord, *Madden v. Kaiser Foundation Hospitals* (1976) 17 Cal.3d 699, 710–712.) And even if plaintiffs had read the pertinent provision on the *front* and seen the words "arbitration clause" buried therein, they still would have been surprised nearly three years later, when they first learned that the arbitration provision, located on the *back*, was overly harsh.

Similarly, a federal district court found that the arbitration provision in a Sale Contract is procedurally unconscionable, explaining: "[T]he Court is able to find both elements of oppression and surprise, which renders the arbitration agreement procedurally unconscionable. [The buyer] asserts that when he was given the purchase agreement, it was presented to him on a take-it-or-leave it basis and was not afforded an opportunity to negotiate any of the pre-printed terms on the form. . . . In the approximately twenty to thirty minutes that [the buyer] took to sign the agreement, the

dealership representative directed his attention to the front side of the form, which was the only area where a signature was required. . . . [The buyer] was never informed that . . . the [Sale Contract] contained an arbitration clause located on the back-side of the form. . . .

"[The car dealer] maintains that there was no surprise because the arbitration clause was prominently displayed on the back-side of the form in a box titled 'ARBITRATION CLAUSE,' and that [the buyer] nonetheless signed next to a paragraph [on the front side] mentioning the arbitration clause. . . . The Court is unpersuaded. The location of an arbitration clause on the back of a dense pre-printed form where the purchaser is not required to sign does relatively little to notify the consumer that such clause exists. Although the paragraph on the *front* mentions the arbitration clause on the *back*, the language lies imbedded inconspicuously within a paragraph of the same font size, and [to the right of] . . . where the [buyer's] signature was required. . . . [The buyer's] failure to notice the reference to the arbitration clause on the front side of the agreement was a result of the term being 'hidden in a prolix printed form drafted by the [the dealer].'" (*Lau v. Mercedes-Benz USA, LLC* (N.D.Cal., Jan. 31, 2012, No. CV 11-1040 MEJ) 2012 U.S. Dist. Lexis 11358, pp. *22–*23 [2012 WL 370557, p. *8], italics added.)

In sum, the arbitration provision satisfies the two elements of procedural unconscionability: oppression and surprise. Plaintiffs were presented with the Sale Contract on a take-it-or-leave-it basis. Its preprinted terms were not negotiable. The contract was a single two-sided page. The arbitration provision, which was printed on the back side, was unnoticeable to buyers who were told where to sign on the front side and were not given an opportunity to see that the contract had provisions on the back or to read the provisions on either side.

We conclude that the arbitration provision exhibited a high degree of procedural unconscionability. Because of the format of the Sale Contract and the way in which the finance manager controlled and directed its execution, the buyers knew nothing about the arbitration provision, placing the parties' agreement to arbitrate on a weak legal

17

foundation. Given the high degree of procedural unconscionability, plaintiffs were required to show a relatively lower degree of substantive unconscionability. (See *Pinnacle Museum Tower Assn. v. Pinnacle Market Development (US), LLC*, *supra*, 55 Cal.4th at p. 247.) But they also made a strong showing of substantive unconscionability, as we discuss next.

## C. Substantive Unconscionability

"Of course, simply because a provision within a contract of adhesion is not read or understood by the nondrafting party does not justify a refusal to enforce it. The unbargained-for term may only be denied enforcement if it is also *substantively* unreasonable. . . . Substantive unconscionability focuses on whether the provision is overly harsh or one-sided and is shown if the disputed provision of the contract falls outside the 'reasonable expectations' of the nondrafting party or is 'unduly oppressive.' . . . Where a party with superior bargaining power has imposed contractual terms on another, courts must carefully assess claims that one or more of these provisions are one-sided and unreasonable." (*Gutierrez*, *supra*, 114 Cal.App.4th at p. 88, citations omitted.)

A contract term is substantively unconscionable if it is either (1) overly harsh *or* (2) so one-sided as to shock the conscience. (*Pinnacle Museum Tower Assn. v. Pinnacle Market Development (US), LLC*, *supra*, 55 Cal.4th at p. 248, citing *24 Hour Fitness, Inc. v. Superior Court* (1998) 66 Cal.App.4th 1199, 1213 ["substantive element . . . traditionally involves contract terms that are so one-sided as to 'shock the conscience,' *or* that impose harsh or oppressive terms" (italics added)].) An arbitration agreement "'can provide a "margin of safety" that provides the party with superior bargaining strength a type of extra protection for which it has a legitimate commercial need without being unconscionable. . . . However, unless the "business realities" that create the special need for such an advantage are explained in the contract itself . . . , it must be factually established.'" (*Armendariz*, *supra*, 24 Cal.4th at p. 117.)

We conclude that four clauses in the arbitration provision are unconscionable. First, if an arbitration award exceeds $100,000, the losing party may appeal the decision to a panel of three arbitrators. Second, an appeal is permitted if an award includes

injunctive relief.  Third, the appealing party must pay, in advance, "the filing fee and other arbitration costs subject to a final determination by the arbitrators of a fair apportionment of costs."  Fourth, the provision exempts repossession from arbitration while requiring that a request for injunctive relief be submitted to arbitration.  These clauses impose an unduly oppressive burden on buyers.  In assessing unconscionability, we focus on the practical effect of a provision, not a facial interpretation.  (*Saika v. Gold* (1996) 49 Cal.App.4th 1074, 1079–1080 (*Saika*).)

### 1.  Appeal of Award Exceeding $100,000

Under the Sale Contract, either side may appeal to a three-member panel an adverse award exceeding $100,000.  As courts have recognized, this type of provision has the effect of benefiting the party with superior bargaining power, here, Assael BMW, and places an unduly harsh burden on the weaker party.

In *Little v. Auto Stiegler, Inc*. (2003) 29 Cal.4th 1064, an employment case, the arbitration provision allowed either party to appeal an initial award to a second arbitrator if it exceeded $50,000.  The Supreme Court found the provision unconscionable, stating: "[The employer] and its amici curiae . . . claim that the arbitration appeal provision applied evenhandedly to both parties and that . . . there is at least the possibility that an employer may be the plaintiff, for example in cases of misappropriation of trade secrets. . . . But if that is the case, they fail to explain adequately the reasons for the $50,000 award threshold.  From a plaintiff's perspective, the decision to resort to arbitral appeal would be made not according to the amount of the arbitration award but the potential value of the arbitration claim compared to the costs of the appeal.  If the plaintiff and his or her attorney estimate that the potential value of the claim is substantial, and the arbitrator rules that the plaintiff takes nothing because of its erroneous understanding of a point of law, then it is rational for the plaintiff to appeal.  Thus, the $50,000 threshold inordinately benefits defendants.  Given the fact that [the employer] was the party imposing the arbitration agreement and the $50,000 threshold, it is reasonable to conclude it imposed the threshold with the knowledge or belief that it would generally be the defendant.

"Although parties may justify an asymmetrical arbitration agreement when there is a 'legitimate commercial need' . . . , that need must be 'other than the employer's desire to maximize its advantage' in the arbitration process. . . . There is no such justification for the $50,000 threshold." (*Little v. Auto Stiegler, Inc*., *supra*, 29 Cal.4th at p. 1073, citations omitted; accord, *Gibson v. Nye Frontier Ford, Inc*. (Alaska 2009) 205 P.3d 1091, 1098 & fn. 26.)

*Little* relied in part on *Saika*, *supra*, 49 Cal.App.4th 1074. In *Saika*, a patient signed a "Patient-Physician Arbitration Agreement" before undergoing a chemical skin peel of her face. The agreement provided that if an award exceeded $25,000, either party could request a trial de novo in superior court, and the arbitration award would be null and void. (*Id.* at p. 1077.) After the medical procedure, the patient filed a civil suit against the physician, alleging medical malpractice based on severe burns. The physician successfully moved to compel arbitration. The arbitrators awarded the patient $325,000. The physician filed a request for a trial de novo. The patient responded by filing (1) a motion to strike the physician's request, and (2) a petition to confirm the arbitration award. The trial court granted the physician's request for a trial de novo and denied the patient's motion to strike and petition to confirm.

The Court of Appeal reversed, stating: "A trial de novo clause within the arbitration agreement purportedly allows either party to disregard the results of the arbitration and litigate in the courts when the arbitration award *exceeds* $25,000, but . . . the practical effect of the clause is to tilt the playing field in favor of the doctor. By making arbitration virtually illusory as far as one side is concerned, the clause contravenes the strong public policy favoring arbitration." (*Saika*, *supra*, 49 Cal.App.4th at pp. 1076–1077.)

The court acknowledged that an arbitration award in favor of a patient in a malpractice case typically exceeds $25,000 by such a substantial amount that only the *physician* would invoke the trial de novo clause. In contrast, a claim by a physician against a patient, most likely a billing matter, would rarely result in an award exceeding $25,000, especially if the patient had private health insurance or was covered by some

20

type of governmental assistance program. As the court explained: "True, there is a theoretical class of cases where the trial de novo clause could arguably benefit a patient— namely, situations where the initial arbitration award *exceeds* $25,000 but is *still so low* that it represents an injustice. . . . For example, the case before us appears to involve facial disfigurement. The arbitrators handed down what appears, at least insofar as the record discloses, an appropriately large award. Had they only given [the patient] $25,001, the trial de novo clause would . . . have been of some benefit to her.

"But . . . [a]s a practical matter, the benefit which the trial de novo clause confers on patients is nothing more than a chimera. The odds that an award will *both* (a) clear the $25,000 threshold but (b) *still* be so low that the *patient* would *want* to have a trial de novo are so small as to be negligible. . . . [T]he cases where the trial de novo clause could possibly benefit the patient are going to be rare indeed.

". . . [W]hile the trial de novo clause in the present case purports to apply to both parties, it is the same 'heads I win, tails you lose' proposition that the court condemned in [prior case law.] [¶] . . . [¶]

". . . [P]ublic confidence in arbitration in large part depends on the idea that arbitration provides a *fair* alternative to the courts. That confidence is manifestly undermined when provisions in arbitration clauses provide that when one side wins the game doesn't count. . . . Alternative dispute resolution must be a genuine *alternative* to litigation in the courts, not a sham process by which one party to an agreement can increase the total costs of making a claim against it." (*Saika*, *supra*, 49 Cal.App.4th at pp. 1080–1081, citation omitted.)

The same analysis applies here. Car buyers will rarely benefit from the right to appeal where an adverse award exceeds $100,000 because they, not the dealer, are more likely to recover such an award and be satisfied with it; the car dealer would most likely appeal such an adverse award to a three-member panel. Under the Sale Contract in this case, plaintiffs are obligated to pay a total of $28,721.04 over six years. In comparison, Assael BMW's obligations under the Sale Contract and California law are to sell a vehicle in working condition, to avoid making misleading or false representations, and to

21

comply with various consumer protection laws, the violation of which could result in substantial damages, including punitive damages. Given the remedies available under the consumer protection laws, an award in a buyer's favor could readily exceed $100,000.[5] Simply put, there is no justification for the $100,000 threshold, other than to relieve the car dealer of liability it deems excessive. A truly balanced provision would allow the buyer to appeal if he or she recovered *less than* $100,000.

### 2. Appeal of Award that Includes "Injunctive Relief"

The arbitration provision allows an appeal by either side if an award against it contains "injunctive relief." Although "injunctive relief" is not defined in the Sale Contract, the plain meaning of that term would include a temporary restraining order (TRO), a preliminary injunction, and a permanent injunction. An appeal of an award containing injunctive relief is unduly harsh because the buyer, not the car dealer, would typically be the party obtaining that type of relief.

"[I]mmediate injunctive relief [is often] essential to protect consumers against further illegal acts of the defendant." (*People v. Pacific Land Research Co*. (1977) 20 Cal.3d 10, 20.) In litigation by consumers, "the importance of providing an effective injunctive remedy becomes manifest." (*Barquis v. Merchants Collection Assn*. (1972) 7 Cal.3d 94, 107.)

Preliminary injunctive relief is appropriate only if two interrelated factors are established: (1) the plaintiff is likely to prevail on the merits at trial; and (2) the interim harm the plaintiff is likely to sustain in the absence of an injunction is greater than the harm the defendant will probably suffer if an injunction is issued. (*Vo v. City of Garden Grove* (2004) 115 Cal.App.4th 425, 433.) A consideration of interim harm includes the

---

[5] This potential recovery does not include any civil penalties under the Tire Recycling Act ($25,000 per violation). It is not evident that the act may be privately—as opposed to administratively—enforced. The parties did not brief this issue, and we express no view on the subject.

inadequacy of other remedies, including damages, and the degree of irreparable injury the denial of the injunction would cause.  (*Id.* at p. 435; *Intel Corp. v. Hamidi* (2003) 30 Cal.4th 1342, 1352; 6 Witkin, Cal. Procedure (5th ed. 2008) Provisional Remedies, § 337, p. 282.)

Preliminary injunctions are of particular importance in protecting the interests of consumers.  (See, e.g., *Regents of University of California v. ABC, Inc.* (9th Cir. 1984) 747 F.2d 511, 521; *Sanderson Farms, Inc. v. Tyson Foods, Inc.* (D.Md. 2008) 547 F.Supp.2d 491, 508–509; *R.L. Polk & Co. v. INFOUSA, Inc.* (E.D.Mich. 2002) 230 F.Supp.2d 780, 796–797; *F.T.C. v. Staples, Inc.* (D.D.C. 1997) 970 F.Supp. 1066, 1091–1092; see also *Vo v. City of Garden Grove*, *supra*, 115 Cal.App.4th at p. 435 [one factor weighing against issuance of preliminary injunction is any adverse effect it would have on public interest].)

The buyer, not the car dealer, would usually be the party seeking preliminary or permanent injunctive relief, primarily to enforce consumer protection laws like the CLRA.  If an interim award (a preliminary injunction) or final award (permanent injunction) is issued against the car dealer, then the arbitrator has favorably reviewed the merits of the buyer's claims and determined that the interests of consumers will be irreparably injured without injunctive relief.  (See *White v. Davis* (2003) 30 Cal.4th 528, 553–554; *Millennium Rock Mortgage, Inc. v. T.D. Service Co*. (2009) 179 Cal.App.4th 804, 812.)

Yet the appeal clauses in the arbitration provision allow the car dealer to delay the effect of an injunction by way of appellate review before a three-member arbitration panel.  By subjecting injunctive relief to an appeal process, only the car dealer is benefited, making the clause overly harsh on consumers and undermining the purpose of the CLRA to protect consumer rights.

In addition, the arbitration provision is silent as to the procedure for taking an appeal.  Presumably, if the arbitrator issues a *preliminary* injunction in the form of an *interim* award, the car dealer may appeal at that time, putting the entire case, including the injunction, on hold pending a decision by the three-member appellate panel.  This

delay is inconsistent with the enforcement of consumer rights laws and the expediency of the arbitration process.

### 3. Payment of Fees and Costs on Appeal

As provided in the arbitration provision, if either side files a claim and recovers nothing, it "may request a new arbitration under *the rules of the arbitration organization* by a *three*-arbitrator panel. The *appealing party* requesting new arbitration shall be responsible for the *filing fee and other arbitration costs* subject to a *final determination* by the arbitrators of a fair apportionment of costs." (Italics added.)

But the American Arbitration Association (AAA) rules and procedures do not mention arbitration costs when a consumer appeals an initial award to a three-member panel. Indeed, the AAA rules and procedures do not contemplate or provide for an appeal of any kind. (See AAA, Supplementary Procedures for Consumer-Related Disputes <http://www.adr.org/consumer> [as of June 4, 2013]; see also AAA, Commercial Arbitration Rules and Mediation Procedures (eff. June 1, 2009) <http://www.adr.org/ aaa/faces/rules> [as of June 4, 2013].) And the appeal clauses in the Sale Contract require the appealing party to pay the fees and costs for *both* sides *in advance*, subject to reallocation at the conclusion of the arbitration. Even if the rules and procedures of the AAA or another arbitration organization did *not* require the appealing party to pay such expenses, the Sale Contract states that "the provisions of this Arbitration Clause shall control."

The CLRA confers unwaivable statutory rights on consumers and accords them some of the rights set forth in *Armendariz*, *supra*, 24 Cal.4th at pages 103–113. (See *Gutierrez*, *supra*, 114 Cal.App.4th at p. 95 & fn. 14; *D.C. v. Harvard-Westlake School* (2009) 176 Cal.App.4th 836, 854–855 [discussing *Gutierrez*].) One of those rights limits the payment of arbitral expenses by the consumer.

Under the CLRA, a consumer does not have to pay arbitration costs or arbitrator fees (arbitral expenses) that he or she cannot afford or that are prohibitively high. (See *Gutierrez*, *supra*, 114 Cal.App.4th at pp. 82–83, 89–90, applying *Armendariz*, *supra*, 24 Cal.4th at pp. 110–111, and *Green Tree Financial Corp.-Ala. v. Randolph* (2000)

531 U.S. 79, 90 [121 S.Ct. 513].) Nevertheless, the appeal clauses mandate that the appealing party bear the arbitral expenses for *both* sides unless and until the expenses are reapportioned at the end of the proceeding. But reapportionment *at the conclusion* of the arbitration is inadequate. (See *Gutierrez*, at p. 90.) "[That] possibility . . . provides little comfort to consumers . . . who cannot afford to initiate the [appeal] process in the first place." (*Ibid.*) Items covered by an advance payment on appeal include, as stated in the Sale Contract, "the filing fee and other arbitration costs." Arbitrator fees in Los Angeles average around $450 per hour, and here, the appeal is heard by *three* arbitrators. (See ADR Services, Inc., Southern California Mediation & Arbitration Panel <http://www. adrservices.org/pdf/JAMP%20(SOCAL)%20fees%208.07.pdf> [as of June 4, 2013].) Hearing room rental costs and the arbitrator's travel expenses may also be included. (See *D.C. v. Harvard Westlake School*, *supra*, 176 Cal.App.4th at p. 849, fn. 4.)

Because the arbitration provision leaves the buyer in the dark as to the amount to be paid in advance and permits, but does not mandate, apportionment at the conclusion of arbitration, it discourages buyers from pursuing an appeal and enforcing their rights under the CLRA. Although the AAA ensures that a consumer does not have to pay an exorbitant sum at the beginning of an arbitration proceeding (see Supplementary Procedures for Consumer-Related Disputes, § C-8 <http://www.adr.org/ consumer> [as of June 4, 2013]), its rules and procedures do not mention an appeal to a panel of arbitrators and, thus, do not set forth the costs associated with an appeal. But whatever the costs of an appeal, the requirement that the appealing party pay the filing fee and arbitration costs of *both* sides *in advance* puts an unduly harsh burden on a consumer.

That is not to say a buyer must be allowed to pursue an appeal without paying anything up front. But the arbitration provision in this case provides no procedure or criteria for determining how much the consumer must advance. As the court explained in *Gutierrez*: "Unconscionability is determined as of the time the contract is made. . . . The flaw in this arbitration agreement is readily apparent. Despite the potential for the imposition of a substantial [advance of costs to appeal], there is no effective procedure for a consumer to obtain a [cost] waiver or reduction. A comparison with the judicial

25

system is striking. . . . [T]he judicial system provides parties with the opportunity to obtain a judicial waiver of some or all required court fees.

"The Government Code prescribes a tripartite means test for litigants seeking such a waiver. . . . The first two tests automatically exempt a party who receives certain designated governmental benefits . . . or who falls below a designated poverty limit . . . . Under the third test, courts have discretion to exempt litigants 'unable to proceed without using money which is necessary for the use of the litigant or the litigant's family to provide for the common necessaries of life.' . . . The Judicial Council, at the Legislature's direction, has provided a set of forms and rules that supplement the Government Code statute. . . . These rules detail the application form . . . , the procedure for determining the application . . . , and when a hearing is required . . . . Denial of the application, in whole or in part, 'shall include a statement of reasons.' . . .

"In contrast, the [arbitration provision here does not indicate] . . . how this process is begun, or who makes the determination, or what criteria are utilized to decide if [costs] should be reduced or deferred. . . .

"We do not mean to suggest that an arbitration agreement requiring the posting of [costs] to initiate the [appeal] process must provide a cost-waiver procedure that duplicates the judicial waiver procedure.  But the agreement must provide some effective avenue of relief from unaffordable fees.  This one does not." (*Gutierrez*, *supra*, 114 Cal.App.4th at pp. 91–92, citations omitted.)  Nor does the arbitration provision in this case.

### 4.  Appeal Where Award is "$0"

An appeal of an initial arbitration award is permitted by the losing side if it brings a claim and recovers nothing.  As Assael BMW sees it, this clause benefits buyers more than itself and renders any other problems with the appeal clause—such as permitting an appeal of an award exceeding $100,000—of no legal consequence.  According to Assael BMW, the clause allowing a "loser appeal" is of such benefit to buyers, as opposed to itself, that the *arbitration provision as a whole* should be deemed valid notwithstanding other unconscionable clauses in the provision.

26

But we cannot say that the "loser appeal" clause benefits one side more than the other in the absence of statistical evidence, which neither side has provided. For example, without statistics, we do not know whether buyers or car dealers file more claims against the other side. Buyers might seek relief if they believe their vehicle is defective, the defect is covered by a warranty, and the dealer has not fixed the problem. On the other hand, if a buyer defaults on the monthly payments due under the Sale Contract, the car dealer may seek a deficiency judgment if, after repossessing the vehicle and selling it, the sale proceeds are less than what the buyer owes on the loan. (See generally *Bank of America v. Lallana* (1998) 19 Cal.4th 203, 206–208 [in seeking deficiency judgment against defaulted purchaser of vehicle, creditor must comply with provisions of Rees-Levering Motor Vehicle Sales and Finance Act (Civ. Code, §§ 2983.2, subd. (a), 2983.8) and California Uniform Commercial Code (Cal. U. Com. Code, § 9504, subds. (2)(b), (3)]; see also *Arguelles-Romero v. Superior Court* (2010) 184 Cal.App.4th 825, 845, fn. 21 [if assignee of vehicle purchase contract repossesses vehicle due to buyer's default under loan, assignee would have to pursue any deficiency judgment in arbitral forum, not court, subject to mutual exemption for small claims cases].)

For all we know, car dealers bring more claims against buyers than buyers bring against dealers, and a buyer, when defending a claim, prevails more often than the dealer, resulting in an award of "$0" for the dealer. If that were so, the "loser appeal" clause would work to the advantage of the dealer and would not lessen the overly harsh effect of the other problems with the contractual right to appeal to a three-member panel. Consequently, we reject Assael BMW's contention that the "loser appeal" clause benefits the buyer to such an extent that it "cures" the overly harsh effect of the clauses (1) permitting an appeal when an award exceeds $100,000, (2) permitting an appeal when an award includes injunctive relief, and (3) requiring the buyer to advance the fees and costs of *both sides* if the buyer appeals.

Finally, we note that the foregoing analysis also applies to the exemption from arbitration of small claims cases. Absent a statistical study, we cannot say that the contractual right to bring a small claims case benefits one side more than the other.

### 5. Remedies Exempt from Arbitration

The arbitration provision expressly exempts from arbitration "self-help remedies such as repossession," which is perhaps the most significant remedy from the car dealer's perspective. The buyer has no effective self-help remedies against a car dealer, and none of the buyer's remedies is exempt. Yet one of the most important remedies to a buyer—injunctive relief—is subject to arbitration. While a buyer is more likely to seek an injunction against a car dealer than vice versa, we cannot conceive of a situation where the dealer would be requesting that type of relief against a buyer. Here, the buyers seek injunctive relief under the CLRA and the UCL.

In *Flores v. Transamerica HomeFirst, Inc.* (2001) 93 Cal.App.4th 846, the plaintiffs obtained a reverse mortgage on their home. The loan agreement contained an arbitration clause requiring the arbitration of all controversies with the exception of self-help remedies, stating: "'[T]his Section does not limit [the lender's] right to foreclose against the Property (whether judicially or non-judicially by exercising [its] right of sale or otherwise), to exercise self-help remedies such as set-off, or to obtain . . . appointment of a receiver from any appropriate court, whether before, during or after any arbitration.'" (*Id.* at p. 850.) The plaintiffs filed suit against the lender, alleging fraud, unfair business practices, and violation of the CLRA. The lender moved to arbitrate the case. The trial court denied the motion. The Court of Appeal affirmed, stating that "[a]s a practical matter, by reserving to itself the remedy of foreclosure, [the lender] has assured the availability of the only remedy it is likely to need. . . . The clear implication is that [the lender] has attempted to maximize its advantage by avoiding arbitration of its own claims." (*Id.* at p. 855.)

We do not hold that the exemption of repossession by itself is unconscionable. Our concern is that the arbitration provision exempts the most important remedy to the

28

car dealer but does not exempt any of the buyer's remedies, in particular, injunctive relief.

By exempting repossession—to which only the car dealer would resort—from arbitration, while subjecting a request for injunctive relief—the buyer's remedy—to arbitration, the Sale Contract creates an unduly oppressive distinction in remedies.  This is especially so given that the California Arbitration Act (Code Civ. Proc., §§ 1280–1294.2) exempts TRO's and preliminary injunctions from arbitration, allowing an application for "provisional" remedies to be filed directly in court (*id.*, § 1281.8).  Nevertheless, the Sale Contract dictates otherwise.

As several courts have held, arbitration provisions are unconscionable if they provide for the arbitration of claims most likely to be brought by the weaker party but exempt from arbitration claims most likely to be filed by the stronger party.  (See *Armendariz, supra*, 24 Cal.4th at p. 119; *Baker v. Osborne Development Corp.* (2008) 159 Cal.App.4th 884, 896; *Fitz v. NCR Corp.* (2004) 118 Cal.App.4th 702, 709, 724–725; *Mercuro v. Superior Court, supra*, 96 Cal.App.4th at pp. 175–176, 179; *Stirlen v. Supercuts, Inc.* (1997) 51 Cal.App.4th 1519, 1528–1529, 1539–1542.)  That rule should apply here because the Sale Contract mandates the arbitration of one of the buyers' most important remedies—injunctive relief—while exempting the car dealer's remedy of choice—repossession.

Given that repossession may be either a self-help remedy *or* a judicial remedy (see Cal. U. Com. Code, § 9609, subd. (b)), Assael BMW cannot justify exempting self-help remedies—of which the buyer has none—from arbitration while requiring that injunctive relief—a remedy unique to buyers—be sought only in arbitration.  As provided by statute: "After default, a secured party may do *both* of the following:  [¶]  (1) Take possession of the collateral.  [¶] (2)  Without removal, render equipment unusable and dispose of collateral on a debtor's premises . . . . [¶] . . . A secured party may proceed . . . in either of the following ways:  [¶] . . . Pursuant to *judicial process*.  [¶] . . . *Without judicial process*, if it proceeds *without breach of the peace*."  (Cal. U. Com. Code, § 9609, subds. (a)–(b), italics added.)  The statute "does not define or explain the conduct

that will constitute a breach of the peace, leaving that matter for continuing development by the courts." (4 Witkin, Summary of Cal. Law (10th ed. 2005) Secured Transactions in Personal Property, § 178, p. 745.) "In considering whether a secured party has engaged in a breach of the peace, . . . courts should hold the secured party responsible for the actions of others taken on the secured party's behalf, including independent contractors engaged by the secured party to take possession of collateral." (Official Comments on U. Com. Code, com. 3, Deering's Ann. Cal. U. Com. Code (2003 ed.) foll. § 9609, pp. 576–577.) For example, a creditor is liable for conversion if it hires a licensed "repossessor" (see Bus. & Prof. Code, §§ 7500–7511) who takes a vehicle by engaging in force or by making threats of force. (*Henderson v. Security Nat. Bank* (1977) 72 Cal.App.3d 764, 770.) A creditor is also liable for conversion if it or its agent repossesses a vehicle "by means of an unlawful entry" (*id.* at p. 770), for instance, by "breaking the lock on [the debtor's] garage door" (*ibid.*). And a debtor has a viable cause of action against a creditor for conversion where the creditor seizes a vehicle and thereafter rejects the debtor's demand to return personal property located in the vehicle. (*Varela v. Wells Fargo Bank* (1971) 15 Cal.App.3d 741, 744–745, 749–750; see *Rochon v. Pacific Coast Mtg. Co.* (1931) 111 Cal.App. 298, 300–302 [although purchaser of vehicle understated amount of personal debt on loan application, constituting misrepresentation, seller was liable for conversion where (1) it repossessed vehicle pursuant to provision in sales contract authorizing taking of vehicle if borrower's financial position endangered rights or security of seller, and (2) borrower had made all payments due under contract].)

A hypothetical illustrates the disadvantage imposed on the buyer. Assume that after a car is sold, the dealer assigns the Sale Contract to the bank that financed the purchase. Months later, in conversations between the buyer and the bank's representatives, the bank adopts the erroneous position that the buyer is in default. The buyer goes to the bank, discusses the matter with bank employees, and presents documentation showing that the account is current. But the bank relies on its own computer-generated summary of the buyer's account—a summary that contains material errors showing the buyer is in default. (Cf. *Varela v. Wells Fargo Bank*, *supra*,

30

15 Cal.App.3d at pp. 745–749.) Notwithstanding the "considerable confusion in [the bank's] records of the [buyer's] payments" (*id.* at p. 745), the bank recommends "'repossession on sight'" (*id*. at p. 747). Meanwhile, the buyer, wary of the bank's incompetence, decides to prevent the seizure of the car. Under the Sale Contract as presently written, the buyer cannot seek a TRO in a judicial forum to prohibit repossession; his or her only option would be to file a claim in arbitration and seek a TRO from an arbitrator. If the buyer succeeded in that effort, the bank could then appeal the TRO to a panel of three arbitrators. Of course, long before the TRO and appeal process would be completed, the bank could simply engage in self-help and take the car, leaving the buyer with no means of transportation.

## D.     The *Broughton/Cruz* Rule

Our Supreme Court has held that, because injunctive relief sought under the CLRA and the UCL prevents future deceptive practices against the general public, a request for an injunction under those acts is not subject to arbitration. (*Broughton v. Cigna Healthplans* (1999) 21 Cal.4th 1066, 1079–1080 [CLRA]; *Cruz v. PacifiCare Health Systems, Inc*. (2003) 30 Cal.4th 303, 315–316 [UCL].) Assael BMW contends that *Broughton* and *Cruz* were implicitly overruled by *Concepcion*, *supra*, 131 S.Ct. 1740. We do not reach this issue because, regardless of whether *Broughton/Cruz* survives *Concepcion*, we would conclude that the arbitration provision in the Sale Contract is unconscionable and unenforceable.

The arbitration provision requires that a request for injunctive relief be submitted to the arbitrator and permits an appeal of an injunction to a panel of three arbitrators. We have analyzed the arbitration provision as written, without regard to *Broughton* and *Cruz*. Put another way, we have examined the arbitration provision to determine whether it is unconscionable without considering whether *Broughton* and *Cruz* remain good law. Assuming for the sake of argument that *Broughton* and *Cruz* have been overruled by *Concepcion*, as Assael BMW contends, the arbitration agreement is unconscionable and unenforceable for the reasons previously stated. If, on the other hand, *Broughton* and *Cruz* have not been overruled, the arbitration provision is still unenforceable. Under the

31

*Broughton/Cruz* rule, the arbitration provision is unconscionable because it (1) requires a party—the buyer—to seek injunctive relief from an arbitrator instead of a judge and (2) permits an appeal of injunctive relief to a panel of three arbitrators, who, under *Broughton/Cruz*, may not hear the matter. Thus, we would reach the same conclusion even if *Concepcion* overruled the *Broughton/Cruz* rule.

## E. Car Dealer's Advance of Arbitration Fees

The arbitration provision states that the car dealer "will *advance* your filing, administration, service or case management fee and your arbitrator or hearing fee all up to a maximum of $2500, which may be reimbursed by decision of the arbitrator at the arbitrator's discretion." (Italics added.) Plaintiffs contend this clause is unconscionable because it requires them to pay all fees incurred in the arbitration that exceed $2,500.

Plaintiffs have offered no evidence about the amount of fees that might be imposed on either side in an arbitration proceeding; they have made no showing that a buyer's fees may exceed $2,500. The clause obligating the dealer to pay the buyer's fees up to a maximum of $2,500 does not require the buyer to pay any of the *dealer's* fees even if the buyer is the losing party. Rather, the Sale Contract provides that if any of the *buyer's own* fees exceed $2,500, the buyer will have to pay them.

And under the AAA rules, the only fee imposed on a consumer is a $200 filing fee; the business must pay the remaining fees, including the arbitrator fees, as well as a $1,500 filing fee. (See Supplementary Procedures for Consumer-Related Disputes, § C-8 <http://www.adr.org/consumer> [as of June 4, 2013].) Thus, the AAA rules, in conjunction with the car dealer's obligation to advance up to $2,500 of the buyer's costs, mean the buyer will ultimately pay no more that $200 in arbitration fees and may end up paying no arbitration fees at all. As stated, however, the AAA rules and procedures do not contemplate an appeal to an arbitration panel, and, consequently, we do not know what a consumer must pay to pursue an appeal. (See pt. II.C.3., *ante*.)

## F. Severance or Nonenforcement

"'If the court as a matter of law finds the contract or any clause of the contract to have been unconscionable at the time it was made the court may refuse to enforce the

contract, or it may enforce the remainder of the contract without the unconscionable clause, or it may so limit the application of any unconscionable clause as to avoid any unconscionable result.' [(Civ. Code, § 1670.5, subd. (a).)] The trial court has discretion under this statute to refuse to enforce an entire agreement if the agreement is 'permeated' by unconscionability. . . . An arbitration agreement can be considered permeated by unconscionability if it 'contains more than one unlawful provision. . . . Such multiple defects indicate a systematic effort to impose arbitration . . . not simply as an alternative to litigation, but as an inferior forum that works to the [stronger party's] advantage.' . . . 'The overarching inquiry is whether "'the interests of justice . . . would be furthered'" by severance.'" (*Lhotka v. Geographic Expeditions, Inc*. (2010) 181 Cal.App.4th 816, 826, citations omitted.)

The arbitration provision in the Sale Contract suffers from four defects, all of which tilt the arbitration decidedly in favor of the car dealer and impose overly harsh terms on the buyer. First, a party may appeal to a panel of three arbitrators an initial adverse *monetary* award that only the buyer is likely to receive—an award exceeding $100,000. While the car dealer, as the defending party in an arbitration proceeding, may appeal an adverse award it considers too high, the buyer, when the claimant, cannot appeal a monetary award it considers too low, other than a total loss. Second, a party may appeal an award of injunctive relief—a remedy only the buyer would likely seek—to a three-member panel, undermining the urgency of that type of remedy in stopping unlawful conduct affecting other consumers. Third, the requirement that the buyer, when appealing, pay the expenses of *both sides in advance* discourages enforcement of the CLRA and imposes an unduly harsh burden on the buyer. Fourth, the remedy of most importance to the dealer—repossession—is exempt from arbitration, but one of the buyer's most significant remedies—injunctive relief—is not exempt. These defects lead us to conclude that the arbitration provision is permeated by unconscionability.

"[T]here is no *single* [clause] a court can strike or restrict in order to remove the unconscionable taint from the [arbitration provision]. Rather, the court would have to, in effect, reform the [provision], not through severance or restriction, but by augmenting it

33

with additional terms. Civil Code section 1670.5 does not authorize such reformation by augmentation, nor does the arbitration statute. Code of Civil Procedure section 1281.2 authorizes the court to refuse arbitration if grounds for revocation exist, not to reform the [arbitration provision] to make it lawful. Nor do courts have any such power under their inherent limited authority to reform contracts. . . . Because a court is unable to cure this unconscionability through severance or restriction and is not permitted to cure it through reformation and augmentation, it must void the entire [arbitration provision]." (*Armendariz*, *supra*, 24 Cal.4th at pp. 124–125, citations omitted, italics added.)

Having found that the arbitration provision contains several invalid clauses, we typically would remand the case to the trial court, allowing it, as a discretionary matter, to decide whether the doctrine of severability should apply. (See *Armendariz*, *supra*, 24 Cal.4th at pp. 122, 124.) Yet "an arbitration agreement *permeated by unconscionability*, **or** *one that contains unconscionable aspects that cannot be cured* by severance, restriction, or duly authorized reformation, should not be enforced." (*Id.* at p. 126, italics & boldface added.) That is precisely what the record establishes here: The arbitration provision in the Sale Contract is permeated by unconscionability. Thus, it would be pointless to remand the case for a determination of severability. (See *Elisa B. v. Superior Court* (2005) 37 Cal.4th 108, 122; *First American Title Ins. Co. v. Superior Court* (2007) 146 Cal.App.4th 1564, 1575–1576; *Jones v. First American Title Ins. Co.* (2003) 107 Cal.App.4th 381, 390; *John Hancock Mutual Life Ins. Co. v. Setser* (1996) 42 Cal.App.4th 1524, 1536, fn. 13.)

Accordingly, we conclude the arbitration provision is procedurally and substantively unconscionable. The provision is permeated by unconscionability. Thus, the trial court erred in granting the motion to compel arbitration. And because the arbitration provision is invalid, it cannot provide a basis for striking the class allegations in the complaint. This case will now be heard in a judicial forum, where plaintiffs may seek to certify a class. It follows that the trial court's order is reversed in its entirety.

34

## III

## DISPOSITION

The order is reversed, and the trial court is directed to enter a new order denying the motion to compel arbitration and the motion to strike the class allegations in the complaint.  Plaintiffs are entitled to costs on appeal.

CERTIFIED FOR PUBLICATION.


                                                    MALLANO, P. J.

I concur:


JOHNSON, J.

35

Rothschild, J., concurring in the judgment:

I agree that the arbitration agreement is unconscionable for the following reasons: First, it is procedurally unconscionable because it is a contract of adhesion. (*Nyulassy v. Lockheed Martin Corp.* (2004) 120 Cal.App.4th 1267, 1280 & fn. 11.) Second, it is substantively unconscionable because (1) the provision making monetary awards of more than $100,000 appealable is unfairly one sided, and (2) the provision requiring the appealing party to advance all costs of the appeal is unfairly one sided. Third, the unconscionable aspects of the agreement are not severable or susceptible of reformation. I therefore concur in the judgment.

ROTHSCHILD, J.